`IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  07-81038-CIV-HURLEY/HOPKINS

SHEET METAL WORKERS LOCAL 28
PENSION FUND, Individually and on behalf
of all others similarly situated,

      Plaintiffs,

v.

OFFICE DEPOT, INC., STEVE ODLAND and
PATRICIA McKAY,

      Defendants.

_____

**CONSOLIDATED AMENDED COMPLAINT**

_____

**TABLE OF CONTENTS**

NATURE OF THE ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

THE PARTIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Lead Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

CLASS ACTION ALLEGATIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.    Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    B.    Materially False and Misleading Statements Issued
        During the Class Period. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

OFFICE DEPOT ANNOUNCES RESTATEMENT AND ADMITS FRAUD. . . . . . . . . . . . . 25

ADDITIONAL FALSE STATEMENTS AND DESCRIPTION OF
DEFENDANTS' SCIENTER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    A.    The Statements of Confidential Witnesses Compel
        a Finding of Scienter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    B.    The Company Violated GAAP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        1.    Violations of GAAP Relating to Vendor Rebates. . . . . . . . . . . . . . . . 42

        2.    Violations of GAAP Associated with Inventory
            and Reserve Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    C.    Lack of Internal Controls. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    D.    Defendants Violations of the Company's "Critical
        Accounting Policies". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

    E.    Defendants Explanation of Increases in Gross Profit
        Set Forth in Management's Discussion and Analysis
        Were Materially False and Misleading. . . . . . . . . . . . . . . . . . . . . . . . . . . 56

      F.      The Terms of the Audit Committee Charter Were Violated. . . . . . . . . . . . . . . . 57

      G.     Defendants Violated the Company's Code of Ethics.. . . . . . . . . . . . . . . . . . . . 59

      H.     Additional Scienter Allegations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

NO SAFE HARBOR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

APPLICABILITY OF PRESUMPTION OF RELIANCE
FRAUD-ON-THE-MARKET DOCTRINE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

LOSS CAUSATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

COUNT 1
      Alleged For Violations Of Section 10(b) Of The
      1934 Act And Rule 10b-5 Promulgated Thereunder
      Against All Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

COUNT II
      Alleged for Violations Of Section 20(a) Of The
      1934 Act Against Individual Defendants.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

PRAYER FOR RELIEF.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

JURY DEMAND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Lead Plaintiff, the New Mexico Educational Retirement Board ("New Mexico ERB"), by and through its attorneys, on behalf of itself and the Class it seeks to represent, and for its Consolidated Amended Complaint, makes the following allegations against Defendants based upon the investigation conducted by and under the supervision of Plaintiff's counsel, which included, *inter alia*, reviewing and analyzing information and financial data relating to the relevant time period obtained from numerous public and non-public sources, including, among others, United States Securities and Exchange Commission (the "SEC") filings for Office Depot Inc. ("Office Depot" or the "Company"), annual reports, press releases, published interviews, news articles, securities analysts reports and advisories about the Company, media reports (such as Bloomberg, Dow Jones, and LEXIS-NEXIS), interviews with former employees of the Company, and discussions with accounting and damages experts.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      The present action involves a massive financial fraud perpetrated by Defendants which had the effect of erasing billions of dollars in shareholder value.  As detailed herein, Defendants have admitted that the financial statements published throughout most of the relevant period contained materially false information.  Moreover, the numerous confidential witnesses cited herein confirm that Defendants acted with the requisite scienter in promulgating the illegal scheme.

2.      Between October 17, 2006 and October 26, 2007,[1] from all outward appearances, everything seemed to be going well at Office Depot.  During this period, after all, the Company was riding a wave of "sales growth in each of our Divisions," and continually meeting or exceeding analyst earnings per share ("EPS") estimates. As a result, shares of Office Depot's common stock traded at artificially inflated prices.

3.      What investors could not have known, however, is that the reported earnings and related metrics were nothing but an apparition.  In truth, the Company was overstating its reported gross profit, operating profit, net earnings and EPS as a result of the intentional misreporting of vendor rebates.  Moreover, as the confidential witnesses cited herein detail, the Company was failing to properly account for inventory, as well as manipulating its reserve accounts to artificially enhance earnings.  As more was revealed by the Company, it became apparent that the irregularities in the accounting methodology for the Company's vendor programs was little more than a thin disguise for accounting fraud, with Office Depot ultimately admitting that its inquiry revealed "errors in timing of vendor program recognition and included evidence that some individuals within the company's merchandising organization failed to provide Office Depot's accounting staff with complete or accurate documentation of future purchase or performance conditions in certain vendor programs that would have otherwise required recognition of the related vendor funds to be deferred into future periods in accordance with the company's established practices." All told, this

---

[1]As discussed herein, the full truth of the Company's financial condition remained hidden until February 26, 2008 when Office Depot announced the need for increases in its reserve accounts and the write-down of inventory.  The class period is from October 17, 2006 through February 25, 2008 (the "Class Period").

contrivance wreaked havoc at Office Depot until the Company was forced to concede that tens of millions of dollars in earnings had been falsely reported.

4.      Faced with such misconduct, Office Depot was obligated to "restate" the net income it had reported for 2006 and the first two quarters of 2007.  To be sure, a restatement is no minor event.  In fact, reporting guidelines mandated by the SEC clarify that a restatement is required for the correction of material errors in previously issued financial statements.  Thus, the restatement here *constitutes an unqualified admission that the originally published financial statements contained material false statements.*  Thankfully, these type of material false statements are infrequent in today's corporate environment, but they were the very upshot of the regrettable state of affairs at Office Depot.  As the Company itself tacitly admitted, the restatement was the ultimate result of a fraudulent scheme, which lead to the termination of numerous employees and the untimely departure of the Chief Financial Officer.

5.      Regrettably, at the time of the announcement of the restatement, the Company continued to mislead investors by understating its inventory reserve accounts.  These accounts had been tapped in the first and second quarters of 2007 to prop-up earnings, and despite dramatically increasing obsolescence of inventory, remained at artificially low levels.  However, faced with a formal SEC investigation, and additional internal pressures from the whistleblower, the Company was forced to "reset" reserves and write-off additional inventory amounts on February 26, 2008, causing another plunge in share price.

6.      It must be emphasized that Office Depot certified time and again during the Class Period that it had developed "internal controls" sufficient "to provide reasonable assurance regarding the reliability of financial reporting and the preparations of financial statements for external purposes

-3-

in accordance with generally accepted accounting principles." In fact, no such safeguards existed, and Defendants have now conceded that the Company suffered from material deficiencies in its internal controls.

7.     The facts and circumstances behind the reality that the Defendants issued financial statements containing material errors are described in particularized detail by the various confidential witnesses interviewed by counsel for New Mexico ERB, all of whom worked at Office Depot during the pertinent time frame. According to these persons, the Defendants (i) knowingly or recklessly accelerated purchases as part of its scheme to improperly recognize vendor rebates prematurely; (ii) manipulated operations to materially understate inventory; and (iii) further manipulated its reserve accounts to artificially pump up earnings.

8.     Naturally, as news of the misconduct at Office Depot reached the market, the price of the Company's stock plummeted. More precisely, the cumulative effect of the Company's admissions caused the stock to fall more than 14% to as low as $16.51 on the day the likelihood of a restatement was revealed. In the trading days after the Company admitted the error of its inventory reserve, the stock fell an additional 22%. All told, the Company lost over $9 billion in market capitalization from the Class Period high.

9.     The preceding summary makes evident what the remainder of this Complaint establishes convincingly: Defendants knowingly and/or recklessly issued false and misleading financial statements during the Class Period that were not presented in accordance with Generally Accepted Accounting Principles ("GAAP") and thus, as a matter of law, violated the 1934 Act by containing errors and irregularities which led to the Company's eventual restatement. Such failure to accurately report was the result of intentional and reckless conduct by the Defendants.

-4-

## JURISDICTION AND VENUE

10.     Lead Plaintiff brings this action pursuant to the 1934 Act as amended (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the 1934 Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

12.     Venue is proper in this District pursuant to § 27 of the 1934 Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c).  Defendant Office Depot maintains its principle executive office in this District, and substantial acts in furtherance of the alleged fraud occurred within this District.

13.     Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce in connection with the acts alleged in this complaint, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

**A.     Lead Plaintiff**

14.     Court-appointed Lead Plaintiff, the New Mexico ERB, purchased Office Depot common stock during the Class Period, as described in the certifications previously filed with the Court, and was damaged thereby.

**B.     Defendants**

15.     Defendant Office Depot is organized under the laws of Delaware and has its principal executive offices at 2200 Old Germantown Road, Delray Beach, Florida 33445.  During the Class Period, Office Depot's shares were listed and actively traded on the NYSE under the symbol "ODP." According to its Form 10-K/A filed November 20, 2007 for the period ending December 30, 2006,

there were approximately 272,972,960 shares outstanding of Office Depot common stock as of October 27, 2007.

16.     Defendant Steve Odland ("Odland") served as the Company's Chair and Chief Executive Officer ("CEO") throughout the Class Period.  Immediately prior to joining Office Depot, Inc., he was Chair, Chief Executive Officer, and President of AutoZone, Inc. from 2001 until March 2005. Previously he was an executive with Ahold USA from 1998 to 2000. Odland was President of the Foodservice Division of Sara Lee Bakery from 1997 to 1998. He was employed by The Quaker Oats Company from 1981 to 1996 in various executive positions.  In 2006, Odland was paid $11,749,081 by Office Depot.  In 2007, Odland was paid $12,863,046 by Office Depot.

17.     Defendant Patricia McKay ("McKay") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") throughout the Class Period.  Previously, McKay had served as the Executive Vice President and Chief Financial Officer of Restoration Hardware. She has also worked as the Vice President of Finance at AutoNation, and Vice President of Finance and Controller at Dole Food Company.  In 2006, McKay was paid $2,210,013 by Office Depot.

18.     Defendants Odland and McKay shall be collectively referred to herein as the "Individual Defendants."   The Individual Defendants and Defendant Office Depot shall be collectively referred to as "Defendants."

19.     Because of the Individual Defendants' positions with Office Depot, each had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers

and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

20.     Moreover, the Retail North American Division is undoubtedly a core component of Office Depot's corporate structure.  As such, the Individual Defendants, in their capacities as Chair, CEO and CFO of Office Depot, are deemed to have intimate knowledge of its operations.  *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("Knowledge may be imputed to individual defendants when the disclosures involve the company's core business.").  On this very topic, Judge William C. Conner of the Southern District of New York recently observed,

> [T]he fact that those statements concerned the core operations of the company supports the inference that the defendant[s] knew or should have known the statements were false when made.  Indeed, if facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them.  Accordingly, if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company.

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).

21.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above.  Each of the above officers, by virtue of their high-level positions with Office Depot, directly participated in the management of Office Depot, was directly involved in the day-to-day operations of Office Depot at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in

-7-

drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

22.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the 1934 Act, and was traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violate these specific requirements and obligations.

23.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Office Depot, each of the Individual Defendants had access to the adverse undisclosed information about Office Depot's financial condition and performance as particularized herein and knew (or recklessly disregarded)

that these adverse facts rendered the positive representations made by or about Office Depot and its business issued or adopted by the Company materially false and misleading.

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Office Depot, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

25.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Office Depot common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme:  (i) deceived the investing public regarding Office Depot's business, operations, management and the intrinsic value of Office Depot common stock; and (ii) caused Lead Plaintiff and other members of the Class to purchase Office Depot common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

26.     Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons who purchased the common stock of Office Depot during the period from October 17, 2006 through February 25, 2008 and who were damaged thereby.  Excluded from the Class are the Defendants herein, the

-9-

officers and directors of the Company, members of their immediate families, any affiliate and/or subsidiary of Office Depot, any entity in which any excluded person has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and assigns of any excluded person.

27.    Because Office Depot has hundreds of millions of shares of common stock outstanding, and because the Company's common stock was actively traded during the Class Period, members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members can only be determined by appropriate discovery, Lead Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by Office Depot or its transfer agent.

28.    Lead Plaintiff's claims are typical of the claims of the members of the Class because Lead Plaintiff and other Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

29.    Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation. Moreover, Lead Plaintiff has no interests that are contrary to or in conflict with the interests of the members of the Class it seeks to represent.

30.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress

the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

31.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether Defendants' publicly disseminated releases and statements during the Class Period omitted and misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(c)     whether Defendants participated in and pursued the fraudulent scheme and course of business complained of;

(d)     whether Defendants acted with scienter;

(e)     whether the market prices of Office Depot common stock during the Class Period were artificially inflated due to the material nondisclosures and misrepresentations complained of herein; and

(f)     whether members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

-11-

## SUBSTANTIVE ALLEGATIONS

### A.  Background

32.      Office Depot is a global supplier of office products and services that operates a chain of office product warehouse stores in the United States, Canada, France and Japan, primarily servicing the small business and home office markets.  In fiscal year 2006, the Company reported that it sold $15 billion of products and services to consumers and businesses of all sizes through three business segments: North American Retail Division, North American Business Solutions Division and International Division.  Sales are processed through multiple channels, consisting of office supply stores, a contract sales force, internet sites, direct marketing catalogs and call centers, all supported by the Company's network of crossdocks, warehouses and delivery operations.

### B.  Materially False And Misleading Statements Issued During the Class Period

33.      Throughout the Class Period, Defendants made statements to the market which included, though were not limited to, SEC filings, press releases, analyst conference calls and information set forth on the Company's website. As an initial matter, *it is critical to note that despite Defendants' repeated statements that the Company's financial statements were prepared in accordance with GAAP and Regulation S-X, and that it possessed controls and procedures sufficient to insure the material accuracy of its financial statements, they now concede that the financial statements issued by the Company for 2006 and the first two quarters of 2007 were false and misleading, contained material errors, and were prepared without adequate internal accounting controls.*  Moreover, as detailed herein, Defendants' manipulation of its inventory reserve account was likewise violative of GAAP and Regulation S-X.

34.     The Class Period begins on October 17, 2006 with the Company filing its Form 8-K with the SEC and issuing a press release announcing the Company's earnings for the quarter ending September 30, 2006.  According to the Form 8-K and press release detailing the purported results of the third quarter, the Company's gross profit was $1.186 billion, operating profit was $191 million, net earnings were $133 million and diluted earnings per share were $0.47.  These gross profit, operating profit, net earnings and EPS numbers were repeated in the Company's Form 10-Q for the quarter ending September 30, 2006 filed with the SEC on October 17, 2006.

35.     Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Office Depot's Form 10-Q for the third quarter of 2006 contained sworn certifications, signed by Defendants Odland and McKay, respectively, that attested to the effectiveness and accuracy of the Company's internal controls over financial reporting. In relevant part, Defendants Odland and McKay each certified that:

1.     I have reviewed this Quarterly Report on Form 10-Q of Office Depot, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

-13-

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

36.     The statements in Office Depot's October 17, 2006 press release and its Form 10-Q

for the third quarter of 2006 were materially false and misleading because they failed to disclose and

misrepresented the following adverse facts:

(a)     that Office Depot's gross profit, operating profit, net earnings and earnings per share were materially overstated;

(b)     that the Company's financial statements were not prepared in accordance with GAAP;

(c)    that the internal controls at Office Depot were inadequate because, at a minimum, they failed to cause proper accounting for vendor rebates which was in violation of GAAP; and

(d)    the sworn Sabanes-Oxley certifications signed by Odland and McKay were plainly false for the reasons set forth in subparagraphs (a) through (c).

37.    On February 14, 2007 the Company filed a Form 8-K with the SEC and issued a press release announcing the Company's earnings for the year ending December 30, 2006.  According to the Form 8-K and press release detailing the purported results of the year, the Company's gross profit was $4.667 billion, operating profit was $733 million, net earnings was $516 million and diluted earnings per share was $1.79.  These gross profit, operating profit, net earnings and EPS numbers were repeated in the Company's Form 10-K for the year ending December 30, 2006 filed with the SEC on February 14, 2007.

38.    Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Office Depot's Form 10-K for the fiscal year 2006 contained sworn certifications, signed by Defendants Odland and McKay, respectively, that attested to the effectiveness and accuracy of the Company's internal controls over financial reporting. In relevant part, Defendants Odland and McKay each certified that:

1.    I have reviewed this Annual Report on Form 10-K of Office Depot, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules

-15-

13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

39.     Additionally, Defendants Odland and McKay each executed the Certification of CEO and CFO Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which attests:

-16-

In connection with the Annual Report on Form 10-K of Office Depot, Inc. (the "Company") for the fiscal year ended December 30, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Steve Odland, as Chief Executive Officer of the Company, and Patricia McKay, as Chief Financial Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, to each officer's knowledge:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

40.   Furthermore, as part of Office Depot's 2006 10-K, Defendants Odland and McKay executed a report on Internal Control Over Financial Reporting, which provides in relevant part,

Management of Office Depot is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers and effected by the company's board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those polices and procedures that:

•   pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the company;

•   provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

•   provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

-17-

Management assessed the effectiveness of the company's internal control over financial reporting as of December 30, 2006. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework.

Based on our assessment, management believes that, as of December 30, 2006, the company's internal control over financial reporting is effective.

41. The statements in Office Depot's February 14, 2007 press release and its Form 10-K for fiscal 2006 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a) that Office Depot's gross profit, operating profit, net earnings and earnings per share were materially overstated;

(b) that the Company's financial statements were not prepared in accordance with GAAP;

(c) that the internal controls at Office Depot were inadequate because, at a minimum, they failed to cause proper accounting for vendor rebates which was in violation of GAAP; and

(d) the sworn Sabanes-Oxley certifications signed by Odland and McKay were plainly false for the reasons set forth in subparagraphs (a) through (c).

42. On April 26, 2007 the Company filed a Form 8-K with the SEC and issued a press release announcing the Company's earnings for the period ending March 31, 2007. According to the Form 8-K and press release detailing the purported results of the first quarter of 2007, the Company's gross profit was $1.272 billion, operating profit was $227 million, net earnings were $156 million and diluted earnings per share were $0.56. These gross profit, operating profit, net earnings and EPS numbers were repeated in the Company's Form 10-Q for the period ended March 31, 2007 filed with the SEC on April 26, 2007.

43.     Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Office Depot's Form 10-Q for the first quarter of 2007 contained sworn certifications, signed by Defendants Odland and McKay, respectively, that attested to the effectiveness and accuracy of the Company's internal controls over financial reporting. In relevant part, Defendants Odland and McKay each certified that:

1.      I have reviewed this Quarterly Report on Form 10-Q of Office Depot, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

-19-

     (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

     (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

44.    The statements in Office Depot's April 26, 2007 press release and its Form 10-Q for the first quarter of 2007 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

     (a)    that Office Depot's gross profit, operating profit, net earnings and earnings per share were materially overstated;

     (b)    that the Company's financial statements were not prepared in accordance with GAAP;

     (c)    that the internal controls at Office Depot were inadequate because, at a minimum, they failed to cause proper accounting for vendor rebates which was in violation of GAAP, and failed to properly account for inventory reserves; and

     (d)    the sworn Sarbanes-Oxley certifications signed by Odland and McKay were plainly false for the reasons set forth in subparagraphs (a) through (c).

45.    On July 26, 2007 the Company filed a Form 8-K with the SEC and issued a press release announcing the Company's earnings for the period ending June 30, 2007. According to the Form 8-K and press release detailing the purported results of the second quarter of 2007, the

Company's gross profit was $1.101 billion, operating profit was $154 million, net earnings was $109 million and diluted earnings per share was $0.40. These gross profit, operating profit, net earnings and EPS numbers were repeated in the Company's Form 10-Q for the period ended June 30, 2007 filed with the SEC on July 26, 2007.

46.     Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Office Depot's Form 10-Q for the second quarter of 2007 contained sworn certifications, signed by Defendants Odland and McKay, respectively, that attested to the effectiveness and accuracy of the Company's internal controls over financial reporting. In relevant part, Defendants Odland and McKay each certified that:

1.     I have reviewed this Quarterly Report on Form 10-Q of Office Depot, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting

and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

47.    The statements in Office Depot's July 26, 2007 press release and its Form 10-Q for the second quarter of 2007 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a)    that Office Depot's gross profit, operating profit, net earnings and earnings per share were materially overstated;

(b)    that the Company's financial statements were not prepared in accordance with GAAP;

(c)    that the internal controls at Office Depot were inadequate because, at a minimum, they failed to cause proper accounting for vendor rebates, and failed to properly account for inventory and reserves, which was in violation of GAAP; and

(d)     the sworn Sabanes-Oxley certifications signed by Odland and McKay were plainly false for the reasons set forth in subparagraphs (a) through (c).

48.     On November 20, 2007 the Company filed a Form 8-K with the SEC and issued a press release announcing the Company's earnings for the quarter ending September 29, 2007. According to the Form 8-K and press release detailing the purported results of the first quarter, the Company's gross profit was $1.115 billion, operating profit was $122 million, net earnings was $117 million and diluted earnings per share was $0.43. These gross profit, operating profit, net earnings and EPS numbers were repeated in the Company's Form 10-Q for the quarter ending September 29, 2007 filed with the SEC on November 20, 2007.

49.     Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Office Depot's Form 10-Q for the third quarter of 2007 contained sworn certifications, signed by Defendant Odland, that attested to the effectiveness and accuracy of the Company's internal controls over financial reporting. In relevant part, Defendant Odland certified that:

1.     I have reviewed this Quarterly Report on Form 10-Q of Office Depot, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

-23-

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

50.     The statements in Office Depot's November 20, 2007 press release and its Form 10-Q for the third quarter of 2007 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

-24-

(a)     that Office Depot's gross profit, operating profit, net earnings and earnings per share were materially overstated;

(b)     that the Company's financial statements were not prepared in accordance with GAAP;

(c)     that the internal controls at Office Depot were inadequate because, at a minimum, they failed to cause proper accounting inventory and reserves which was in violation of GAAP; and

(d)     the sworn Sabanes-Oxley certification signed by Odland was plainly false for the reasons set forth in subparagraphs (a) through (c).

## OFFICE DEPOT ANNOUNCES RESTATEMENT AND ADMITS FRAUD

51.     On October 29, 2007, Office Depot announced that the Company had delayed the distribution of its third-quarter earnings release and related conference call and webcast, previously scheduled to take place on October 30, 2007, due to the commencement of an independent review by the Audit Committee of the Company's vendor program funds.  The review related principally to the timing of the recognition of certain vendor program funds.

52.     Following this revelation of possible improprieties in the Company's vendor programs and related accounting practices, Office Depot's stock price plunged $2.86, or 14 percent, to close at $17.43 in the biggest decline in the Company's stock price in over seven years.  As a result of the announcement, at least three analysts lowered their ratings on Office Depot amid fears of a forthcoming restatement of the Company's previously filed financial statements.

53.     Stock analysts that follow the Company were stunned by the revelation.  FTN Midwest Securities Corp. analyst Anthony Chukumba commented that the announcement "is certainly another black mark on the management team this year.  This development can't help investor confidence in the company."  Furthermore, Gary Balter, an analyst with Credit Suisse,

-25-

downgraded the Company's rating and recommended that investors sell the stock because of the likelihood of a restatement.

54.    Similarly, Paul R. Brown, dean of Lehigh University's College of Business and Economics stated, "[c]onducting an internal investigation of the program is troubling because it's not that common.  The outcome could lead to a restatement of Office Depot's financials."

55.    Balter and Brown's fears were realized on November 8, 2007.  On that date, Office Depot announced the results of an independent review by its Audit Committee that was initiated as a result of a whistleblower complaint related to the accounting for vendor programs during the third and fourth quarters of 2006 and the first two quarters of 2007. The Company's description of the result of the review, as contained in the Form 10-K/A for 2006 is as follows:

> This Amendment No. 1 to the annual report on form 10-K/A ("Form 10-K/A") is being filed to amend the company's annual report on Form 10-K for the year ended December 30, 2006, which was originally filed on February 14, 2007 ("Original Form 10-K").

> On October 29, 2007, Office Depot announced that its Audit Committee initiated an independent review principally focused on the accounting for certain vendor program funds. The review, which arose from a whistleblower complaint, was conducted with the assistance of independent legal counsel and forensic accountants.  The investigation revealed errors in the timing of recognition of certain vendor program funds.  The impact of these errors is to reduce previously reported gross profit, operating profit, net earnings and earnings per share in fiscal 2006 and the first two quarters of 2007 and defer recognition into future periods. Additionally, inventories and tax accounts have been adjusted on the consolidated balance sheet related to these deferrals.

> As a result of the Audit Committee's review, on November 8, 2007, the Board of Directors of the company approved a decision to restate the company's 2006 financial statements including corrections to amounts previously reported in the third and fourth quarters of 2006 and the interim financial statements for the first and second quarters of 2007.  The company is hereby amending its previously filed Form 10-K for the fiscal year 2006 and concurrently will file amended Forms 10-Q for the first and second quarters of 2007.  We do not anticipate filing any amended Forms 10-Q for 2006.  The financial statements and related disclosures for the period ended September 30, 2006 have been restated in the company's Form 10-Q for

the quarter ended September 29, 2007 to reflect the impact of the errors discussed above. This Form 10-K/A amends and restates:

- Part I - Item 1A. Risk Factors

- Part II - Item 6.  Selected Financial Data

- Part II - Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations

- Part II - Item 8.  Financial Statements and Supplementary Data

  - Management's Report in Internal Controls Over Financial Reporting

  - Reports of Independent Registered Public Accounting Firm

  - Consolidated Balance Sheets

  - Consolidated Statements of Earnings

  - Consolidated Statements of Stockholders' Equity

  - Consolidated Statements of Cash Flows

  - Notes to Consolidated Financial Statements - the impacts are more fully discussed in Note B - Results of Audit Committee Independent Review and Restatement of Financial Statements

- Part II - Item 9A.  Controls and Procedures

- We are also updating the Signature Page and certifications of our Chief Executive and Chief Financial Officers on Exhibits 31.1, 31.2

56.    Thus, the Company admitted that during the Class Period it violated GAAP and Regulation S-X, overstated its earnings by tens of millions of dollars, and failed to maintain a system of controls and procedures necessary to insure the material accuracy of its financial statements.

-27-

57.     On February 26, the Company filed a Form 8-K with the SEC and issued a press release announcing the Company's earnings for the year ending December 29, 2007.  The Company filed the corresponding Form 10-K on the same day.  The Form 10-K provide, in relevant part,

> accrual for obsolescence is reviewed each period and dynamically adjusted to acknowledge the composition of inventory, selling experience and our future outlook. During 2007, we evaluated and refined our techniques for estimating obsolescence related to certain product categories to better align with proceeds being realized on ultimate disposition. The resulting obsolescence accruals in the first and second quarters were lowered by approximately $6 million and $11 million, respectively, reflecting updated estimates and product dispositions. During the fourth quarter, we increased our obsolescence accrual by approximately $8 million to adjust the value of certain active inventory categories for quantities on hand that exceeded our current selling rate and for certain low margin inventory items with declining realizable values.

Furthermore, the 2007 10-K provides,

> Additionally, we experienced higher levels of inventory shrink, which had a negative impact on operating margin of approximately 30 basis points (or $20 million based on sales of $6.8 billion).

58.     This revelation that the Company required additional write-offs caused the stock price to decline precipitously.

**ADDITIONAL FALSE STATEMENTS AND DESCRIPTION
OF DEFENDANTS' SCIENTER**.

**A.      The Statements of Confidential Witnesses Compel a Finding of Scienter.**

59.     In addition to the admittedly false statements detailed above, and the indicia of scienter created thereby, Plaintiff's Counsel interviewed a number of former employees regarding the Company's misconduct.  As detailed herein, these Confidential Witnesses reveal that the vendor rebate scheme was well-known throughout the Company, and was the result of the excessive pressure brought to bear by management to satisfy Wall Street expectations.  Moreover, a Confidential Witness details the inventory manipulation and reserve account schemes in detail.  The

-28-

import of these statements is to leave little reasonable dispute that Defendants acted with the requisite scienter.

60.     Confidential Witness No. 1 ("CW1") was the Company's Vice President of Supply Chain throughout the Class Period.  In this position, CW1 was intimately involved in the day-to-day operations of the Company's supply channel.  CW1 had frequent contact with persons employed throughout the retail channel, from Defendant Odland (the Chair and CEO) to Merchants (the persons charged with executing buy orders and interacting with vendors).  CW1 explains that in early 2007, the Executive Vice President of Office Depot's supply chain left the Company, and was not immediately replaced.  Following the EVP's departure, day-to-day management of the supply chain was transferred to Monica Luechtefeld (who reported directly to Defendant Odland).  However, because CW1 was at the time the supply chain officer with the most experience, CW1's involvement in all aspects of the operations of the supply chain increased.[2]

61.     Regrettably, with the additional responsibility came knowledge the Company was involved in a myriad of accounting schemes designed to artificially boost reported financial results, including a two-part process designed to understate inventory amounts and overstate income through the premature recognition of vendor rebates.  Particularly, CW1 discovered the improper accounting for vendor rebates which led to the restatement of the Company's reported financial statements for 2006 and the first two quarters of 2007.  During the planning process for the third quarter of 2007, CW1 received a number of emails from the merchandising department discussing the Company's practice of ordering large volumes of product from vendors for the sole purpose of artificially

_____

[2] As discussed herein, CW1 is the "whistleblower" identified by the Company as the individual who revealed the improprieties, and compelled the investigation leading ultimately to the restatement.

achieving the next level of vendor rebate price reductions.  This action was typically taken in the waning days of a fiscal quarter, and the transportation of product would be placed "in limbo," with a third party carrier.  This process of executing buy orders of sufficient amount to reach maximum rebate levels, known as "ordering up," or "buying in" was commonplace, and was done for the sole purpose of increasing quarterly income amounts by prematurely recognizing rebates related to the purchases.

62.    This premature recognition of the vendor rebates was coupled with a scheme to understate inventory levels.  Beginning in the first quarter of 2007, CW1 reports discovering the Company's practice of closing its warehouses a few days prior to quarter-end so that its inventory numbers would be artificially and improperly lowered.  Indeed, CW1 reports that large numbers of warehouse employees were simply told not to report to work, and that those remaining were instructed not to accept any deliveries immediately prior to quarter-end.  CW1 stated that drivers arriving with shipments from vendors were refused access to the warehouse and not permitted to unload until the beginning of the next reporting quarter.  CW1 noted that the mandatory leave policy resulted in costly overtime expenses to the Company arising from processing the backlog of deliveries when the warehouses were reopened.  This two-part practice misled investors because (i) the Company improperly accelerated the vendor rebates into income; and (ii) the Company simultaneously materially understated its inventory amounts.  *See* statements of Confidential Witnesses 2-4.

63.    Concerned by his discovery, CW1 contacted an acquaintance in the Company's internal audit department, Joseph Buckley (the "Internal Auditor"), and told him of the vendor rebate

scheme.[3]  CW1 was instructed by the Internal Auditor to contact the Company's general counsel's office, and on or about September 27, 2007, CW1 met with in-house lawyer Elicia Garcia and Robert Brewer, the Chief Compliance Officer to describe the improper conduct.  CW1 followed up with Ms. Garcia to inquire as to the status of the investigation and offer to assist, but was told he would not be allowed to see the results of the internal audit investigation.

64.     The Internal Auditor, who was tasked with investigating the allegations, later confirmed to CW1 that his assertions were "right on the money," based on his review of purchase orders and interviews with merchandising representatives.

65.     CW1 also relayed the incredible earnings pressure the management team exerted on employees.  Members of the finance team repeatedly told CW1 that "you have to make the numbers."  Moreover, Odland admonished everyone that "everything is based on EPS (earnings per share)."  Indeed, to satisfy street expectations, Defendant Odland stated on numerous occasions that employees "must know what lever to pull to meet earnings goals."

66.     After it became known that CW1 was the whistleblower, he was frequently approached by other employees who, though fearful of their own jobs should they blow the whistle on improper conduct, nonetheless felt obligated to take some action.  Specifically, CW1 was approached by colleagues from the loss prevention and accounting departments with complaints that the Company was manipulating its reserve accounts to make earnings estimates and failing to

---

[3]  Plaintiff's counsel contacted Mr. Buckley to discuss his role in the investigation.  Mr. Buckley indicated that he would "love" to speak with counsel, but after being advised by the Company's general counsel's office that his severance would be terminated if he said anything "disparaging," Mr. Buckley understandably elected to remain silent.  Given that Mr. Buckley met last month with SEC investigators for some 5 hours on these very topics, he no doubt possesses significant, relevant information.

maintain required reserves.  For example, CW1's colleagues complained that the inventory reserve was being improperly reduced from its previously established levels in order to increase gross margins.  CW1 investigated the allegations and discovered that despite an increasing number of store locations, decreasing retail sales and the build-up of some $48 million in obsolete inventory, the Company nonetheless reduced its inventory reserve in the first and second quarters of 2007. Moreover, CW1 discovered that the Company directed the transportation department to ship obsolete inventory from retail to another sales channel to maintain the ruse of saleability, and thereby avoid the writedowns and reserves required by GAAP.  CW1 discussed these facts with Ms. Garcia and Mr. Brewer in January, 2008, but his claims were dismissed.  CW1 confirms that "there was no justification for lowering reserves."

67.     CW1 confirmed that Defendant Odland was a hands-on manager, who was involved in all aspects of the day-to-day operations of the Company.  Indeed, CW1 relayed stories that Odland dictated the amount of packaging material to be included in shipments, and reduced the width of cash register tapes to promote savings.  Moreover, Odland traveled at least quarterly with the supply channel team to visit the Company's warehouses.  Finally, Odland personally executed all contracts with a value of more than $1 million.

68.     CW1 concluded by stating that the Company would never have met Wall Street analyst EPS projections without improper accounting for vendor rebates.

69.     In the Spring of 2008, Office Depot terminated CW1's employment.

70.     Confidential Witness No. 2 ("CW2") worked for Office Depot in Florida from 2005 through April 2008 as Director for Private Brand.  CW2 reported to Senior Vice President for Private Brand Tony Ueber.  CW2 informs that a woman who reported to her was responsible for

-32-

administering the "Global Tender" program at Office Depot.  Tenders are akin to requests for bids, and Office Depot issued tenders to manufacturers for both private brand and branded products.  The idea was to get manufacturers to compete against each other to provide the most competitive price on products to Office Depot so Office Depot could lower its costs.  The deals negotiated through the tender process were typically two to three year contracts.  The savings identified in tender offers were broken down into at least two categories, price per product and up front payments.  As a hypothetical example, CW2 posited Office Depot may have paid $1.00 per pen to a vendor the year before.  During the pendency of the vendor contract, Office Depot issued a tender asking for bids on similar pens at a lower cost.  The bidders then would offer the price at which they could produce and sell the pens to Office Depot, for example $0.95 per pen.  On top of that the venders were also strongly encouraged to offer up front payments.  So a vendor might offer pens at $0.95 per pen, but with $250,000 in up front money payable by the vendor immediately.

71.    Approximately each month or so, CW2 attended "ad hoc" meetings with representatives from finance and with Senior Vice President of Merchandising Scott Koerner.  At these meetings, Koerner explained he was under tremendous pressure to generate vendor "program numbers" to meet targets assigned to him by his boss, the President of North American Retail, Chuck Rubin.  The way to hit those numbers "is to get the money up front" from vendors.  These meetings were focused on reviewing tenders and determining how much up front money was being offered by vendors.  The tender process as it related to CW2 was mostly administrative, focused on getting the bids together.  Then the responsibility shifted to merchants and other merchandising staff under Koerner to actually negotiate the deal and collect the up front payments from vendors.  There was

-33-

a big emphasis placed by Koerner on negotiating and receiving up front payments from vendors before month or quarter end.

72.     The focus from Koerner was to "negotiate as much money up front as possible rather than spreading it out over two or three years." CW2 understood that the revenue was going to be recognized in the period the up front payment was received. The preference at Office Depot was to get as much money up front as possible, even if it meant settling for a less competitive per unit price. The per unit price is something that affects Office Depot over the two to three year life of the contract, but up front payments arrive immediately. The focus was on the short term payments and not the long term cost of the contract in terms of price per product. Koerner had to sign off on any vendor contracts involving upfront payments.

73.     As part of the tender process CW2 met with individual company Merchants. Many Merchants complained to CW2 about the heavy focus on vendor programs and vendor payments. During "all of 2007" CW2 heard about the heavy emphasis of bringing in vendor payments, even before the problems at Office Depot became public in October 2007. CW2 heard about this a lot in 2006 as well. The merchants spent so much time trying to negotiate and collect vendor payments they were left with little time to do the actual work of merchandising, including selecting products and product mix and promotions appropriate to those products. Of the time Merchants spent on the phone with vendors regarding vendor programs, approximately 70% was spent trying to negotiate new payments from vendors and 30% was spent trying to collect promised payments. Merchants continued to complain that the focus on vendor payments was negatively impacting their ability to perform their core job functions through April 2008 when CW2 left Office Depot.

-34-

74.     Confidential Witness No. 3 ("CW3") worked as an Office Depot Associate Merchant from March 2006 through March 2008.  CW3 was responsible for negotiating with vendors for the purchase of laptop and desktop computers.  CW3 reported to and worked closely with Retail Merchant Angela Richter ("Richter"), who reported to the Director of Merchandising Janine Mitchell.

75.     CW3 states that one of a Merchant's primary responsibilities is to collect "marketing dollars" from vendors.  In fact, CW3 and Richter would meet monthly to "see if they were on track to meet commitments to vendors."  When the Company had not made enough purchases to qualify for all possible vendor rebates, CW3 and Richter would decide to "buy into" the vendor program - meaning to purchase more products than needed in order to receive the full amount of rebates.

76.     According to CW3, all of the Office Depot's Merchants used a "proprietary" computer software system to track vendor rebate programs.  When a new vendor rebate program was negotiated, the Merchant entered all relevant details into the software system.  Likewise, a merchant "couldn't collect money from vendors without recording it in the computer system."

77      Confidential Witness No. 4 ("CW4") was a Senior Associate Merchant during the relevant time period.  According to CW4, Office Depot senior management would always make a "big push to get vendor dollars to come in before the close of the quarter."  This was done because Office Depot used "vendor funding as revenue when it shouldn't be."

78.     Confidential Witness No. 5 ("CW5") was a Merchant in the office accessories division at Office Depot during the relevant period.  CW5 stated that a large percentage of a Merchant's time was spent tracking and reporting the progress of his or her vendor rebate programs.

79.     CW5 explained that Office Depot's vendors fell into three categories: companies who

-35-

sell products under their own name via multiple retail chains, companies who sell products under their own name exclusively through Office Depot, and companies that sell their products with an agreement that Office Depot can put its own private label brand on the product. According to CW5, each of these categories of vendors was expected to provide vendor participation money and/or rebates in order to conduct business with the Company.

80.     CW5 detailed the process by which Office Depot budgeted the specific amount of vendor rebates a Merchant was to achieve each year. Defendant CEO Odland would determine the percentage growth he expected in money received from vendor rebates for the period, and would then dictate this number to the Senior Vice President of Merchandising. The Senior Vice President of Merchandising would determine and communicate the vendor rebates budget for each Merchant. This process was described by CW5 as "very top down," and would always result in a budget that was very high and difficult to meet.

81.     CW5 and the other Merchants were required to prepare an official report submitted to Merchandising Finance every month. These reports were "organized and centralized reports" which stayed the same in format each month. The Vice President of Merchandising Finance reviewed each Merchants' report, and then fed the information into a report supplied to Defendant Odland.

82.     If a Merchant was not on pace to meet his vendor rebate budget, he was pressured by the Vice President of Merchandising Finance to find a way to get the full amount. This was sometimes accomplished by "buying into it," which meant buying excess product than what was needed to hit vendor rebate targets.

B.      **The Company Violated GAAP**

83.      During the Class Period, Defendants represented repeatedly that the Company's financial statements were prepared in conformity with GAAP.  These representations were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly employed improper accounting practices which falsely inflated the Company's income and earnings, and understated expenses during the Class Period.  The knowing and/or reckless violations of GAAP are direct evidence of Defendants' scienter.

84.      GAAP, as set forth in AU 411.02, are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

85.      Indeed, compliance with GAAP is a basic fundamental obligation of publicly traded companies. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).

86.     Management is responsible for preparing financial statements that conform with GAAP.  As noted by the American Institute of Certified Public Accountants ("AICPA") Professional Standards in U.S. Auditing Standards ("AU") Section 110.03:

> The financial statements are management's responsibility.  The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process,  and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management.  The auditor's knowledge of these matters and internal control is limited to that acquired through the audit.  Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.  The independent auditor may make suggestions about the form or content of the financial statements of draft, in whole or in part, based on information from management during the performance of the audit. However, the auditor's responsibility for the financial statements he or she has audited is confined to the expression of his or her opinion on them.

87.     Despite the clear and unequivocal obligation that financial statements be prepared in compliance with GAAP, the Defendants caused Office Depot, in violation of GAAP, to record improper vendor rebate income, materially understate inventory, and improperly account for reserves.

88.     Defendants cannot, and do not, dispute that they violated GAAP.  Indeed, on November 8, 2007, in a press release, Office Depot revealed that its financial statements for the reporting periods 2006 through the second quarter 2007 required restating, explaining that the Company had been beset with "errors in timing of vendor program recognition [which] included evidence that some individuals within the company's merchandising organization failed to provide Office Depot's accounting staff with complete or accurate documentation of future purchase or performance conditions in certain vendor programs that would have otherwise required recognition

-38-

of the related vendor funds to be deferred into future periods in accordance with the company's established practices."

89.     Restatements are necessary only in rare and unusual circumstances.  GAAP dictates in FASB 154 that restatements of financial statements are only to be used when there is a change in the reporting entity, when certain specifically identified changes in accounting principles are made, and for the correction of a material error(s) in previously issued financial statements.

90.     In the facts revealed by Office Depot, there has been no change in the reporting entity, and none of the changes in accounting principles specifically identified by FASB 154 were employed in the Company's financial reporting.  Rather, the reasons for restating the financial statements, as revealed by the Company, is for the purpose of correcting material errors.

91.     The restatement required to correct the previously reported financial position of Office Depot shows that the Company and its management failed to comply with Section 13(b)(2)(A) of the 1934 Act which requires that issuers "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."

92.     As a result of accounting improprieties, Office Depot's reported financial results violated, among other things, the following provisions of GAAP for which Defendant are necessarily responsible:

a.      The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities (FASB Statement of Concepts No. 1, ¶ 34);

-39-

b.      The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item (FASB Concepts Statement No. 2, ¶ 132) (SEC Staff Accounting Bulletin No. 99);

c.      The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" (FASB Statement of Concepts No. 1, ¶ 40);

d.      The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Concepts Statement No. 1, ¶ 50);

e.      The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Concepts Statement No. 1, ¶ 42);

f.     The principle that financial reporting should be reliable in that it represents what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting (FASB Concepts Statement No. 2, ¶¶ 58-59);

g.     The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Concepts Statement No. 2, ¶ 80);

h.     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Concepts Statement No. 2, ¶¶ 95, 97);

i.     The principle that contingencies that might result in gains are not reflected in accounts since to do so might be to recognize revenue prior to its realization and that care should be used to avoid misleading investors regarding the likelihood of realization of gain contingencies (FASB No.5, *Accounting for Contingencies*);

j.     The principle that financial statements disclose contingencies when it is at least reasonably possible (e.g., a greater than slight chance) that a loss may have been incurred (SFAS No. 5, ¶ 10) and that financial statements disclose significant risks and uncertainties associated with an entity's operations (AICPA's Statement of Position No. 94-6);

k.     The principle that loss contingencies be recorded in the financial statements when it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated (SFAS No. 5 ¶ 8);

l.      The principle that revenue should only be recognized when it is realized or realizable and earned (SFAS No. 5 ¶ 83); and

m.      The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" (APB No. 28, ¶10)

93.      The strictures of GAAP that Defendants admittedly violated are not arcane or esoteric accounting rules.  Instead, the rules are common sense obligations to recognize revenue only when it is fairly earned, properly count existing inventory, and write-off obsolete inventory.  Defendants' continued violations of these basic rules for more than a year is strong evidence of scienter.

**1.      Violations of GAAP Relating to Vendor Rebates**

94.      Office Depot amended the Form 10-K for the period ending December 30, 2006 in order to restate the financial statement information presented in that annual report covering the last two quarters of 2006.  The first two quarters of 2007 were also restated.  Both were formally amended in filings with the SEC.

95.      The Form 10-K as amended contained the following description of the accounting errors which lead to the restatement:

> The Audit Committee, with the assistance of independent legal counsel and forensic accountants, assessed the timing of recognition of certain vendor program arrangements.  The review, which arose from a whistleblower complaint, revealed that during the period beginning in the third quarter of 2006 through the second quarter of 2007 funds due or received from vendors previously recognized in the current quarter should have been deferred into later periods.

> The investigation revealed errors in timing of vendor program recognition and included evidence that some individuals within the company's merchandising organization failed to provide Office Depot's accounting staff with complete or accurate documentation of future purchase or performance conditions in certain vendor programs that would have otherwise required recognition of the related vendor funds to be deferred into future periods in

accordance with the company's established practices and accounting principals generally accepted in the United States of America.

96.     The applicable accounting literature for vendor rebates is set forth in Emerging Issues Task Force ("EITF") 02-16: Accounting by a Customer (Including a Reseller) for Certain Consideration Received from a Vendor.  This EITF provides as follows:

1.     Cash consideration received by a customer from a vendor is presumed to be a reduction of the prices of the vendor's products or services and should, therefore, be characterized as a reduction of cost of sales when recognized in the customer's income statement, unless

    a)     the cash consideration is actually for goods or services provided by the customer to the vendor, which are sufficiently separate from the customer's purchase from the vendor and which for which a reasonable estimate of fair value can be determined, or

    b)     the cash consideration is a reimbursement of specific, identifiable, incremental costs to sell the vendor's products, which would then reduce the cost incurred specifically instead of the cost of sales.

2.     Cash consideration payable pursuant to a binding arrangement only if the customer completes a specified cumulative level of purchases or remains a customer for a specified time period should be recognized as a reduction of cost of sales based on a systematic and rational allocations as progress is made by the customer toward earning the rebate or refund provided the amounts are probable and reasonably estimable.  If it is not probable and estimable, it should be recognized when cash is received.

Several factors which could impact the probability of achieving the requirements to receive the rebate or refund, and or the ability to estimate amounts to be received were addressed.  They include:

1.     Refunds related to purchases which will occur over a long period of time,
2.     Lack of historical experience with similar products,
3.     A history of having to make significant adjustments to rebates/refunds in the past,
4.     External factors such as changes in market demand or technological obsolescence.

97.     There is no question that the Company violated the required accounting for vendor rebates set forth in EITF-02-16.  The Company reversed $30 million of previously reported income

due to violating GAAP by recognizing vendor rebates before they were earned.  Moreover, CW1, CW2, CW3, CW4 and CW5 each confirm that the practice was widespread and well-known.

### 2.      Violations of GAAP Associated with Inventory and Reserve Accounts

98.      As a basic premise GAAP provides that inventory shall be stated at the lower of cost or market except in certain exceptional cases when it may be stated above cost.  Obviously, the Company's ability to accurately track and report inventory is critical to both complying with GAAP and providing financial analysts with an important metric.

99.      Furthermore, when the operation of business includes the ownership of a stock of goods, it is necessary for adequate financial accounting purposes that inventories be properly compiled periodically and recorded in the accounts.  See ARB43, ch4, ¶1.

100.      Revenues from the sale of inventory, or from the sale of the goods or services in whose production it is used, normally arise in a continuous repetitive process or cycle of operations by which goods are acquired and sold, and further goods are acquired for additional sales.  The major objective in accounting for the goods in the inventory is the matching of appropriate costs against revenues in order that there may be a proper determination of the realized income.  Thus, the inventory at any given date is the balance of costs with concurrent revenues.  This balance shall be carried to future periods provided it does not exceed an amount properly chargeable against the revenues expected to be obtained from ultimate disposition of the goods carried froward.  In practice, this balance is determined by the process of pricing the articles in the inventory. [ARB43, ch4, ¶4]

101.      To comply with the GAAP requirement to value inventory at the lower of cost or market, companies maintain allowances or reserves to account for both obsolescence and shrinkage. The use of those allowances or reserves enable a Company to maintain the integrity of the cost of

-44-

inventory while recognizing the loss in value in the financial statements through a charge to cost of goods sold. Office Depot disclosed that it had a technique for estimating obsolescence for purposes of accruing obsolescence expense each period. The Company disclosed that during 2007 it changed the methodology for estimating the amount of the accrual that resulted in lowering the amount of such accruals for the first and second quarters of 2007. This disclosure failed to quantify the amount of the existing reserve for obsolescence prior to 2007.

102.    In addition to the reserve or allowance for obsolescence the Company also provided an amount for shrinkage each period or at least annually. Neither the methodology or amount of the shrinkage allowance maintained in the inventory accounts was disclosed in the Company's financial statements. However, in the fourth quarter of 2007, the Company disclosed in the management discussion and analysis related to fiscal year 2007 that an excess amount of shrinkage of approximately $ 20 million was recorded in the North American Retail Division. No previous discussion of the excess shrinkage was discussed in the three form 10-Q' s  for fiscal year 2007. Moreover, CW1 makes clear that this write-off did not occur in the fourth quarter, but should have been taken in prior quarters.

103.    In the present matter, there is little dispute that Office Depot improperly manipulated the reporting of its inventory.  Indeed, CW1 reveals the scheme of closing the Company's warehouses a few days before each quarter to reduce inventory amounts.  Such widespread action cannot be said to involve only a few "rogue" employees, but such knowledge is charged as a matter of law to all senior members of management.

104.    The improper method of recognizing vendor program receivables used by the Company focused on the purchasing of inventory sufficient to receive maximum rebates rather than

the need for that inventory.  As confirmed by all of the Confidential Witnesses described in this Complaint, Office Depot would purchase that quantity of inventory necessary to ensure that it obtained the highest rebate level without concern for the amount of inventory needed to support current operating sales levels.  This created excess inventory that required a write-down in the carrying cost of that inventory under GAAP, which would have increased cost of goods sold and thus decreased earnings.  As noted in the restatement, a significant portion of the restated vendor credits could not be properly recognized in excess of a year from the date of the restatement.

105.    GAAP requires that  income and expenses should follow the matching concept.  In the case of vendor rebates, the amount of the rebate should be specifically identified with the inventory and recognized in cost of goods sold as the inventory is actually sold.  As shown by the restatement that was clearly not the practice that was being followed by the Company.  GAAP allows a company with a demonstrated history of estimating the amount of rebates it will receive based on its purchasing estimates throughout the year to recognize vendor rebates, however, the portion of the rebates recognized in cost of goods sold should be recognized at the time of sell and not the time of purchase.  It certainly can never be based solely on purchases regardless of the ability to sell solely to obtain a rebate (*see* EITF 02-16, Accounting by a Customer (Including a Reseller) for Certain Consideration Received from a Vendor).

106.    Moreover, Defendants plainly violated their obligation to properly reserve for, and/or write-down, obsolete inventory.  GAAP requires that,

> A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its cost. If the utility of the goods is impaired by damage, deterioration, obsolescence, changes in price levels, or other causes, a loss [shall]  be reflected as a charge against the revenues of the period in which it occurs. The measurement

of such losses shall be accomplished by applying the rule of pricing of inventories at **cost or market, whichever is lower**. ARB43, ch4,para 8.

[Emphasis Added].

107.     Here, CW1 explains in detail the manner in which the Company violated GAAP by ignoring the obligation to reserve against some $48 million in obsolete inventory.

## C.     <u>Lack of Internal Controls</u>

108.     As discussed above, Defendants were obligated by law to use the generally accepted accounting principles that were appropriate to reflect the business activities of Office Depot. Management also had the responsibility to design, implement, and maintain a system of internal accounting controls that would provide accounting records that reflect the transactions that were consummated by the entity, as further required by the SEC.

109.     More particularly, Section 13 of the 1934 Act requires that:

Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall - -

A.     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

B.     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -

  i.     transactions are executed in accordance with management's general or specific authorization;

  ii.     transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;

  iii.     access to assets is permitted only in accordance with management's general or specific authorization; and

      iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

110.    The Company's Class Period SEC filings fraudulently stated that the Company implemented adequate internal controls:

Management of Office Depot is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers and effected by the company's board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

    •    pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the company;

    •    provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

    •    provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of the company's internal control over financial reporting as of December 30, 2006. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework.

111.    Contrary to such repeated assertions, the myriad of accounting problems recounted herein, resulted from, and remained undisclosed due to, lack of adequate internal controls.  That this was so constitutes a failure of Office Depot and its management to comply with Section 13(b)(2)(B),

-49-

which requires that issuers must "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that–

    i.    transactions are executed in accordance with management's general or specific authorization;

    ii.    transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

    iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

    iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any difference."

112.    Had Office Depot's management instituted sufficient internal controls, the improper premature recognition of vendor rebates would have been prevented, discovered and disclosed and properly accounted for in a timely manner.

113.    To be more specific, Section 302(a) of the Sarbanes-Oxley requires that the signing officers of SEC registrants assume responsibility for the establishment and maintenance of internal controls and that they evaluate them periodically, and within 90 days prior to the issuance of financial reports.

114.    In Office Depot's Form 10-K for the year ended December 31, 2006, (as well as each 10-Q filing during the Class Period) Defendants Odland and McKay signed certifications which contained representations that they and other certifying officers were responsible for establishing and maintaining disclosure controls and procedures and internal control over financial reporting for Office Depot and had:

-50-

Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared.

115.   By including such certifications, Defendants Odland and McKay demonstrated complete awareness of the requirements under Sarbanes-Oxley.  Notwithstanding and in direct contravention of Defendants Odland's and McKay's representations, the Company's internal controls were not effective "to ensure that material information" was included in the Company's financial reporting.  Indeed, if Defendants Odland and McKay had implemented and monitored adequate internal controls, the need for a restatement would have never materialized.

116.   As a result of the restatement of the third and fourth quarters of 2006, management of Office Depot revised its certification to reflect the existence of a material weakness in internal controls as of December 30, 2006.  Following is the revised certificate issued as a result of the restatement :

Management of Office Depot is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers and effected by the company's board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that: pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the company; provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are

subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

As a result of the restatement discussed in Note B to the consolidated financial statements, management reassessed the effectiveness of the company's internal control over financial reporting as of December 30, 2006. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control–Integrated Framework*. Based on our reassessment, management has determined that, as of December 30, 2006, the company's internal control over financial reporting was not effective due to a material weakness related to the accounting for certain vendor program funds. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. This material weakness resulted from deficiencies in the design of internal controls related to ensuring that complete and accurate documentation is provided to individuals responsible for the proper recognition of vendor program funds. The company's independent registered public accounting firm, Deloitte & Touche LLP, has issued an attestation report on our revised assessment of the company's internal control over financial reporting. Their report appears on the following page.

117.    Defendants failure to implement an adequate system of internal controls to accurately track vendor income and inventory is particularly egregious here because the misconduct was well-known and widespread.

**D.    Defendants Violations of the Company's "Critical Accounting Policies."**

118.    In the 2006 Form 10-K, as originally issued, management identified Vendor Arrangements and Inventory Valuation as two Critical Accounting Policies.  Identified as such, senior management recognized the importance of the internal control system with respect to the accounting for transactions affecting those two areas and the proper financial reporting related to those two areas.  In each instance, Defendants violated these accounting policies and as a result the financial statements for Office Depot for the year 2006 and first three quarters of 2007 were materially misstated.

119.    In the 2006 Form 10-K filing, the Company states, in relevant part,

-52-

Our consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America. Preparation of these statements requires management to make judgments and estimates. Some accounting policies have a significant impact on amounts reported in these financial statements. A summary of significant accounting policies can be found in Note A in the Notes to Consolidated Financial Statements. We have also identified certain accounting policies that we consider critical to understanding our business and our results of operations and we have provided below additional information on those policies.

*Vendor arrangements* – Each year, we enter into purchase arrangements with many of our vendors that provide for those vendors to make payments to us if and when certain conditions are met. We generally refer to these arrangements as "vendor programs," and they typically fall into two broad categories, with some underlying sub-categories. The largest category is volume-based rebates. Generally, our product costs per unit decline as higher volumes of purchases are reached. Many of our vendor agreements provide that we pay higher per unit costs prior to reaching a predetermined milestone, at which time the vendor rebates the per unit differential on past purchases, and also applies the lower cost to future purchases until the next milestone is reached. Current accounting rules provide that companies with a sound basis for estimating their full year purchases, and therefore the ultimate rebate level, can use that estimate to value inventory and cost of goods sold throughout the year. We believe our history of purchases with many vendors provides us with a sound basis for our estimates.

If the anticipated volume of purchases is not reached, however, or if we form the belief at any given point in the year that it is not likely to be reached, cost of goods sold and the remaining inventory balances are adjusted to reflect that change in our outlook. We review sales projections and related purchases against vendor program estimates at least quarterly and adjust these balances accordingly.

The second category of arrangements we have with our vendors is event-based programs. These arrangements can take many forms, including advertising support and specific promotional activities. These advertising arrangements generally are classified as a reduction of product costs, reducing costs of goods sold and inventory.

Event-based arrangements include special pricing offered by certain of our vendors for a limited time, payments for special placement or promotion of a product, reimbursement of costs incurred to launch a vendor's product, and various other special programs. These payments are classified as a reduction of costs of goods sold or inventory, as appropriate for the program. Additionally, we receive payments from vendors for certain of our activities that lower the vendor's cost to ship their product. Such receipts are recognized as a reduction of our cost of goods sold.

While vendor rebates are recognized throughout the year based on judgment and estimates, the final amounts due from vendors are generally known soon after year-end. Substantially

-53-

all vendor program receivables outstanding at the end of the year are collected within the three months immediately following year-end. We believe that our historic collection rates of these receivables provide a sound basis for our estimates of anticipated vendor payments throughout the year.

*Inventory valuation* – Our selling model is predicated on the breadth and availability of our product assortment, and our profitability is impacted by inventory turnover rates. We monitor inventory on hand by location, particularly as it relates to trailing and projected sales trends. When slow moving inventory is identified, or we decide to discontinue merchandise, we review for estimated recoverability and, if necessary, record a charge to reduce the carrying value to our assessment of the lower of cost or market. This assessment is based on the quantity of the merchandise, the rate of sale, and our assessment of market conditions. Additional cost adjustments and sales markdowns will be taken as considered appropriate until the product is sold or otherwise disposed. Estimates and judgments are required in determining what items to stock and at what level, and what items to discontinue and how to value them prior to sale.

120.   Obviously, the vendor rebate accounting policy was violated here, as the Company, with the express agreement of the Individual Defendants, was forced to restate its financial statements for premature recognition of vendor payments.

121.   Moreover, Office Depot's premature recognition of $20 million of vendor rebates enabled the Company to meet the consensus stock analyst's estimates of EPS.  Moreover, the fraudulent recognition of the vendor credits allowed management to earn incentive bonuses for the year ended December 30, 2006.

122.   In the critical accounting policies section of the Form 10-K describing Inventory Valuation, the company states that: "Our selling model is predicated on the breadth and availability of our product assortment, and our profitability is impacted by inventory turnover rates."  As noted one scheme used by the Company to manipulate reported inventory turnover was to not receive inventory the last two days of a reporting cycle. The company goes on to say "[w]e monitor inventory on hand by location, particularly as it relates to trailing and projected sales trends.  When slow

-54-

moving inventory is identified, or we decide to discontinue merchandise, we review for estimated recoverability and, if necessary, record a charge to reduce the carrying value to our assessment of the lower of cost or market.  This assessment is based on the quantity of the merchandise, the rate of sale, and our assessment of market conditions."  The shutting down of warehouses to prevent the delivery of merchandise would limit the quantities of inventory on hand and negate the effectiveness of the test for slow moving merchandise.  It further shows that the Company would enter into purchase agreement for the rebates.  The rebates, as demonstrated by the restatement, were then captured as income prematurely.  The Company was entering into purchase agreements for merchandise that the Company would then go to great company-wide efforts to not receive, let alone sell.

123.    Finally in the critical accounting policy for inventories, the Company added a new paragraph to what had been previously contained in the description of the same policy in 2006.  The new paragraph discussed the existence of an allowance for obsolescence which had never before been disclosed.  The new disclosure reads as follows:

> Our accrual for obsolescence is reviewed each period and dynamically adjusted to acknowledge the composition of inventory, selling experience and our future outlook. During 2007, we evaluated and refined our techniques for estimating obsolescence related to certain product categories to better align with proceeds being realized on ultimate disposition. The resulting obsolescence accruals in the first and second quarters were lowered by approximately $6 million and $11 million, respectively, reflecting updated estimates and product dispositions. During the fourth quarter, we increased our obsolescence accrual by approximately $8 million to adjust the value of certain active inventory categories for quantities on hand that exceeded our current selling rate and for certain low margin inventory items with declining realizable values.

124.    The increase in the allowance of obsolete inventory in the fourth quarter of 2007 along with the increase in the allowance for doubtful accounts in 2007 and the fourth quarter adjustments for inventory shrinkage and vendor credits all had the effect of decreasing fourth quarter earnings.

Even more, it allowed the Company to clean up the wreckage that had accumulated throughout the second half of 2006 and the first three quarters of 2007. Tellingly, the fact that there were at least two major adjustments in the fourth quarter was not disclosed in a note to the financial statements as is required by generally accepted accounting principles (APB 28, paragraph 31 as modified by FAS 135, paragraph 4e).

E.     **Defendants Explanation of Increases in Gross Profit Set Forth in Management's Discussion and Analysis Were Materially False and Misleading**

125.     In management's discussion and analysis of the financial statements for 2006, the primary reasons for the increase in gross profit as a percentage of sales over 2005 were described as follows:

> The increase in gross profit as a percentage of sales in 2006 reflects the net impact of **higher private brand sales and better category management**, partially offset by competitive pressures in certain areas and some change in product sales mix. Cost of goods sold in 2006 and 2005 include the negative impact of $1 million and $20 million, respectively, of inventory-related Charges." (Emphasis added).

126.     It is clear that management lacked any basis for the explanation of the increase in gross profit as a percentage of sales from 2005 to 2006, and it was designed to further the scheme to inflate earnings. In truth, $20,000,000 of the gross profit reported was a result of the Company having prematurely recognized vendor arrangements. Another $19 million of the increase in gross profit was due to the $19 million differential between inventory charges in 2006 compared to 2005. That $39 million represented on a percentage basis in excess of 75% of the increase in gross profit percentage and obviously not attributable to "higher private brand sales and better category management." Defendants false attribution for the gain to "higher private brand sales and better category

management" was designed to mislead investors from learning that in reality Defendants were "pulling levers" to manipulate vendor rebates.

**F.**   **The Terms of the Audit Committee Charter Were Violated.**

127.   The Audit Committee Charter provided that:

The Audit Committee is appointed by the Board of Directors (the "Board") of Office Depot, Inc. (the "Company") to assist the Board in monitoring the systems of internal controls, the integrity of the financial reporting process, and the financial statements and reports of the Company; the performance of the Company's internal audit function ("Global Corporate Audit Services" or "GCAS"); assessing and mitigating business and financial risks to the Company; and the compliance by the Company with legal and regulatory requirements. The Committee shall be directly responsible for the appointment (or replacement if appropriate), compensation and oversight of the work of any public accounting firm employed by the Company for the purpose of preparing or issuing an audit report or related work (hereinafter referred to as the, Independent Accountant), and the Independent Accountant shall report directly to the Audit Committee. No public accounting firm serving as the Company's Independent Accountant shall undertake any services for the Company unless and until such services have been specifically approved by the Committee. The Audit Committee shall provide an open avenue for communication among the internal auditors, the Independent Accountant, Management and the Board of Directors.

128.   It is incumbent upon the Audit Committee to see that the following responsibilities are duly discharged in the manner prescribed by applicable law and regulations of the SEC, the NYSE and PCAOB or other applicable laws and regulations, including:

9.   The Committee shall discuss the Company's annual audited financial statements and quarterly financial statements with management and the Independent Accountant, including the company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; and discuss the company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

* * *

10.   In reviewing financial statements that reflect the earnings of the Company, the Committee shall make specific inquiry of the Chief Executive Officer and the Chief Financial Officer regarding the 'quality of earnings' of the Company, from a

-57-

subjective as well as an objective standpoint. Such review shall occur sufficiently in advance of the required filing date(s) for such reports to allow for meaningful input by the Committee.

* * *

14. The Committee shall review with management, the Independent Accountant, and the CCO all interim annual financial reports, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" before they are filed with the SEC or other regulators. Also, the Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee need not discuss in advance each instance in which a company may provide earnings guidance, and it shall be sufficient that the Committee discuss generally with management the types of information disclosed by the Company, the manner of disclosure and the types of presentations made by management to financial analysts and investors.

* * *

17. The Committee shall review with the Independent Accountant and the CCO:

* * *

• The adequacy of the Company's internal controls including computerized information system controls and security.

• Any related significant findings and recommendations of the Independent.

* * *

19. The Committee shall periodically review the Code of Ethical Behavior with the Company to ensure that it is adequate and up-to-date. The Committee also shall review with the CCO and the Company's General Counsel, the results of their review of the Company's monitoring of compliance with the Company's Code of Ethical Behavior.

129. The commitments and statements set forth in the Audit Committee Charter as described and quoted in the preceding paragraphs were not adhered to as required in an ethical business environment because:

-58-

(a)     Office Depot's gross profit, operating profit, net earnings and earnings per share were materially overstated;

(b)     the Company's financial statements were not prepared in accordance with GAAP;

(c)     the internal controls at Office Depot were inadequate because, at a minimum, they failed to cause proper accounting for vendor rebates which was in violation of GAAP;

(d)     Numerous employees were terminated for their involvement in the vendor rebate scheme; and

(e)     the sworn Sabanes-Oxley certifications signed by Odland and McKay were plainly false.

**G.     Defendants Violated the Company's Code of Ethics.**

130.    In addition to the statements contained in those documents filed with the SEC, the Company described to the market its internal business practices.  For example, the Company reported to investors that both its associates and executive management team operated under a strict Code of Ethics, which provides in relevant part,

Corporate ethical and compliance standards must be practiced by all associates every day. This Code of Ethical Behavior (Code) clearly outlines the guidelines that every associate is expected to follow. A guiding principle at Office Depot, Inc., is that all business should be conducted with uncompromising honesty and integrity. We feel this guiding principle has contributed to our success, and is important to our customers, associates, investors, vendors, and regulators. Therefore, it is our responsibility to live up to the expectation that every Office Depot associate does the right thing every day.  Our Code has been adopted by our Board of Directors, and annually all Board members confirm their acknowledgement of our ethical standards. Our Code of Ethical Behavior is available on our Company website so that any interested party can see our ethical standards, and contact either us or our third party administered hotline.  All associates are expected to follow both the spirit and letter of the Code, applicable laws, and the appropriate Office Depot policies and procedures that govern how we conduct ourselves. You should properly evaluate all of the facts and guiding principles before you engage in conduct as a member of the Office Depot team.

-59-

131.   Executive and senior officers were purportedly held to a higher ethical standard consistent with the great trust afforded them by investors.  The Code of Ethics provisions applicable to the senior and executive officers, including the Individual Defendants, provide,

Office Depot's financial statements must fairly and accurately present the financial condition of the business. **The integrity of Office Depot's accounting and financial reporting systems is based on the validity, accuracy and completeness of original entries in the books and records, and supporting documents of the Company**. All transactions affecting Office Depot, directly or indirectly, shall be recorded properly and accurately and documented in Office Depot's books and records in accordance with Office Depot's policies and procedures and generally accepted accounting principles.  No Company fund or asset that is not disclosed or recorded shall be established or maintained, directly or indirectly, for any purpose. You are strictly forbidden to use, authorize or condone the use of any "off book" accounting, secret accounts, unrecorded bank accounts, "slush funds," falsified books, or any other device which may be utilized to distort records or reports of Office Depot's true operating results and financial condition. **If you observe or suspect any such activity, you must report it immediately to the Chief Compliance Officer or Office Depot's General Counsel or call Office Depot's Hotline**. Reporting the Company's proper financial condition is a fundamental aspect of your employment. Reporting false information is strictly prohibited. Misrepresentations of any nature may lead to severe civil or criminal liability for you and Office Depot. Misrepresentations may take the form of omissions and inaccuracies, as well as organizing information in a way that is intended to mislead or misinform the recipient. Criminal liability may attach to violations of the rule at any level in the Company — not just highranking officers.  Office Depot's Chief Financial Officer and its Investor Relations and Public Relations Departments are the Company's sole spokespersons to the financial community and the media.  One aspect of integrity is cooperating openly and honestly with both outside and internal auditors. Making intentionally false statement to an auditor or falsifying or "creating" false documents to give to an auditor is grounds for termination of employment for cause.

The Code of Ethics specifically highlights that,

**Proper financial records are critical to the credibility and integrity of Office Depot**. You are responsible for maintaining accurate, timely and honest financial records. If you are asked by anyone, including your manager, to falsify or "fudge" any financial information, you should immediately call the Hotline, Chief Compliance Officer or the General Counsel. Office Depot's policy is that the Company and associates, trading in the Company's stock and other securities, shall comply with all Securities Laws governing such transactions.

* * *

-60-

It is the policy of Office Depot to comply with all applicable Securities Laws, to inform its associates of the consequences of trading in violation of such laws, and to insist that its associates comply with all applicable Securities Laws when trading in Office Depot securities. As a general rule, Office Depot associates and their families are free to exercise vested stock options, buy and sell ("trade in") Office Depot common stock or other securities as long as they are not in possession of material nonpublic information (also referred to as "inside information") regarding the Company.

* * *

Code of Ethics for the Company's CEO, CFO, and Other Senior Executives Office Depot, Inc., (the "Company") recognizes that the quality, integrity and transparency of its financial statements are of paramount importance in establishing and maintaining the trust and confidence in the Company, its Board of Directors and Management on the part of stockholders, associates, the New York Stock Exchange, the financial community generally, and governmental securities regulatory bodies. Pursuant to the mandate of the Sarbanes-Oxley Act of 2002 (the "Act") and regulations of the United States Securities and Exchange Commission ("SEC") promulgated pursuant to the authority and mandate of the Act, this Code of Ethics has been adopted by the Board of Directors of the Company and duly subscribed to by the CEO, CFO, Controller, Division Presidents and Executive Vice Presidents of the Company (collectively the "Senior Officers") by their signatures at the foot of this Code of Ethics.  Each of the Senior Officers of Office Depot, Inc., is bound by the following Code of Ethics.

[Emphasis Added].

132.    The Code of Ethics further enumerates seven specific commitments of "Each Senior

Officer,"

1.    Be committed to the highest standards of honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between their personal and professional relationships in the performance of their duties as Senior Officers of the Company.

2.    Be committed to the full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications made by the Company, of all information relating to the Company, its financial condition and results of operations.

3.    Be committed to compliance with all applicable governmental laws, rules and regulations relating to the conduct of the businesses of the Company and to required

-61-

reports regarding the financial condition and results of business operations of the Company, including the laws of all countries in which the Company operates.

4.    Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing one's independent judgment to be subordinated to any personal interest.

5.    Respect the confidentiality of information acquired in the course of serving as a Senior Officer of the Company except when authorized or otherwise legally obligated to make disclosure. Confidential information shall not be used for personal advantage.

6.    Report violations of this Code of Ethics to the General Counsel and/or the Chief Compliance Officer of the Company, or directly to the Audit Committee of the Board of Directors of the Company, as soon as practicable after learning of any such violation.

7.    Hold themselves accountable for adherence to this Code of Ethics, and understand that the Company's Board of Directors will hold them accountable, as Senior Officers of the Company, to this Code of Ethics.

133.    The commitments and statements set forth in the Code of Ethics were not adhered to

as required in an ethical business environment because:

(a)    Office Depot's gross profit, operating profit, net earnings and earnings per share were materially overstated;

(b)    the Company's financial statements were not prepared in accordance with GAAP;

(c)    the internal controls at Office Depot were inadequate because, at a minimum, they failed to cause proper accounting for vendor rebates which was in violation of GAAP;

(d)    Numerous employees were terminated for their involvement in the vendor rebate scheme;

(e)    the CFO was terminated; and

(f)    the sworn Sabanes-Oxley certifications signed by Odland and McKay were plainly false.

H.    **Additional Scienter Allegations**

134.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements and documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.    As set forth herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Office Depot, their control over and receipt of Office Depot's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Office Depot were active and culpable participants in the fraudulent scheme alleged herein.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

135.    Concurrent with  the issuance of the 2007 Form 10-K, the Chief Financial Officer, Patricia McKay was terminated and received a most generous settlement agreement totaling approximately $1.930 million, including an unidentified payment of  $482,480, more than required under the terms of her agreement with the Company.

136.    The Internal Auditor who was instrumental in developing the restatement amounts utilized by the independent legal counsel and the forensic accountants who were hired by the Audit Committee to investigate the whistleblower complaint, was forced to leave Office Depot in early 2008.

137.    The Company terminated at least three individuals for their role in the vendor rebate debacle. The departure of the CFO, the Internal Auditor, CW1 and the three supply chain employees together create a strong inference of scienter.

138.    Finally, in the Company's 2007 Form 10-K it is revealed,

We have been cooperating with the staff of the United States Securities and Exchange Commission ("SEC") in an inquiry that commenced in July2007 when the SEC initiated a review of our contacts and communications with financial analysts. The SEC is also reviewing certain other matters, including inventory receipt, timing of vendor payments, timing of recognition of vendor program funds and certain intercompany loans. Prior to filing its quarterly report on Form 10-Q for the quarter ended June30, 2007, the company completed a review of the accounting matters related to inventory receipt, timing of vendor payments and certain intercompany loans, with the assistance of external forensic accountants. Prior to filing the quarterly report on Form10-Q for the quarter ended September29, 2007, the Audit Committee completed a review of the timing of vendor program funds, and the Company amended and restated certain prior period financial statements. In January 2008, the SEC issued a formal order of investigation.

139.    On November 9, 2007, Office Depot filed a Form 8-K and issued a press release revealing that,

On November 5, 2007, Office Depot, Inc., a Delaware corporation (the "Company"), entered into a Letter Waiver dated as of November 5, 2007 (the "Waiver"), with respect to that certain Five Year Credit Agreement dated as of May 25, 2007, by and among the Company and Citicorp USA, Inc. and BNP Paribas as syndication agents, Wachovia Bank, National Association as administrative agent, Citigroup Global Markets Inc. and Wachovia Capital Markets, LLC and BNP Paribas Securities Corp. as joint lead arrangers, and Citigroup Global Markets Inc. as the sole bookrunner (collectively, the "Lenders"), as amended (the "Credit Agreement").

As previously reported by the Company in its Current Report on Form 8-K filed on October 29, 2007, and in a corresponding press release of the same date, the Company has delayed reporting its third quarter financial results pending the completion of an independent review by the Audit Committee of the Board of Directors of the Company's vendor program funds. As reported in Item 4.02 below, the Company has decided to restate its financial statements for certain prior periods. This restatement will result in a delay in the Company's delivery of its financial statements pursuant to the Credit Agreement and a delay in certain of the Company's filings with the Securities and Exchange Commission. Pursuant to the Waiver, the Lenders have agreed to waive the impact of the matters described above, including,

-64-

without limitation, the impact of the events described in the foregoing sentence, (i) to the extent that any restatements of the Company's financial statements for prior financial periods do not result in a net reduction in the aggregate reported earnings of the Company for all periods affected of more than $40,000,000 in the aggregate, and (ii) with respect to the delay in delivery of the financial statements required to be delivered under the Credit Agreement, to the extent that such delay does not extend beyond December 15, 2007 (the "Waived Matters"). The provisions of the Waiver shall terminate on the earlier of (a) December 15, 2007 and (b) the date, if any, that holders of any Debt (as defined in the Credit Agreement) outstanding in a principal or notional amount of at least $50,000,000 shall accelerate or give notice of acceleration of such Debt. The preliminary results of the review have fallen within the parameters of the waiver.

## NO SAFE HARBOR

140.    The federal statutory safe harbor which protects forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Further, none of the statements pleaded herein which were forward-looking statements were identified as "forward-looking statements" when made.  Nor was it stated that actual results "could differ materially from those projected."  Nor were any of the arguably forward-looking statements contained in this Complaint accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of Office Depot who knew the statement was false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

141.    At all relevant times, the market for Office Depot's securities was an efficient market for the following reasons, among others:

(a)     Office Depot's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Office Depot filed periodic public reports with the SEC;

(c)     Office Depot regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Office Depot was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

142.    As a result of the foregoing, the market for Office Depot's securities promptly digested current information regarding Office Depot from all publicly available sources and reflected such information in Office Depot's stock price.  In these circumstances, all purchasers of Office Depot's securities during the Class Period suffered similar injury through their purchase of Office Depot's securities at artificially inflated prices and a presumption of reliance applies.

## LOSS CAUSATION

143.    At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class.

144.    During the Class Period, Defendants' misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Office Depot and its business, operations, performance, and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the

Company's common stock at artificially inflated prices that did not reflect the stock's true value, thus causing the damages complained of herein.

145.    As previously discussed, Office Depot concealed the true extent of its decline in operating profit margins and operating difficulties throughout the Class Period by improper recognition of revenue and understatement of costs and expenses associated with venders, by manipulating its inventory reserves in violation of GAAP and by failing to recognize losses on excess and obsolete inventory.

146.    Office Depot's efforts to conceal the true extent of its operating problems began to unravel in the second half of 2007, especially after a delay in the earnings announcement for the third quarter of 2007 announced on October 29, 2007, the disclosure of the restatement of prior earnings and the third quarter earnings disclosure on November 20, 2007, and the additional disclosure on December 12, 2007 of expected lower margins in the fourth quarter of 2007 (related in large part of the inventory reserve and obsolescence issues set forth in this Complaint and discussed in the following paragraphs).

147.    However, the final disclosure of the extent of the problems directly related to the fraud set forth in this Complaint was not fully revealed until, under pressure from an SEC Investigation, Office Depot finally recognized additional excess inventory and inventory obsolescence issues in its earnings disclosures and conference call on February 26, 2008.

148.    As a result of these various partial disclosures of the "relevant truth(s)" concealed by the fraud set forth in this Complaint, Office Depot's share price fell from $28.95 on July 25, 2007 to $11.37 on February 29, 2008, at total loss of 60.7%.

149.     By comparison, as shown in the attached chart, the price of Office Depot's two primary peers, OfficeMax and Staples, declined on average only 26.5%.  In percentage terms, Office Depot's shares lost 46.6% more than the share prices of its two primary peers.  These investor losses, therefore, were not attributable to economic or industry forces, but, rather, were primarily caused by the limitations on and reversal of Office Depot's overstatement of earnings due to improper recognition of vender credits and inventory obsolescence and reserve issues.

150.     The extent of Office Depot's problems related to the prior misstatements was revealed in the second half of 2007 in a series of progressive, partially corrective disclosure events, including on July 26, September 6, October 29, November 20 and December 12, 2007.  The disclosures on July 26 and September 6, 2007 and related analyst downgrades on July 27, September 6 and October 15, 2007 all led to significant investor losses that were substantially caused by the prior overstatement of operating margins due to the fraud.

151.     By the second quarter of 2007 earnings announcement on July 26, 2007, Office Depot had begun to reach the limit on its ability to continue to conceal its operating profit margin pressures and operating difficulties as a result of the prior improper recognition of vender credits, prior manipulation of inventory reserves and continuing excess inventory and inventory obsolescence issues.  As a result of these limits, the "relevant truth" began to be revealed through lower operating profit margins and lower operating profit guidance provided by various representatives of Office Depot.  Office Depot reportedly began to leak this information to certain analysts well prior to its July 26, 2007 second quarter 2007 earnings disclosure, causing some decline in Office Depot's share price in advance of the disclosure.  The decline in Office Depot's share price on July 26, 2007 was 6.2%, with a further share price decline of 5.0% on July 27, 2007 on analyst commentary and news reports.

-68-

The weakness in Office Depot's operating margins was greater than expected and substantially related in part to the vendor funding and inventory issues set forth in this Complaint. For this reason, a substantial portion of the investor losses on July 26 and 27, 2007 are the foreseeable consequences of the fraud and reflect the limits on Office Depot's ability to continue to inflate its operating margins in the second half of 2007 after already having inflated those margins in 2006 and in the first three quarters of 2007.

152. On September 6, 2007, Office Depot's CFO, Defendant McKay, spoke at a Goldman Sachs retailing conference in New York that was widely attended. Her comments and the comments of Steve Odland, Office Depot's Chair and Chief Executive Office, were also disclosed in a published Fair Disclosure release and widely discussed in news and analysts reports (particularly by Goldman Sachs and Citicorp) September 6 and 7, 2007. As reported by Associated Press early on September 7, 2007, "At a Goldman Sachs retailing conference in New York Thursday, Office Depot Chief Financial Officer Patricia A. McKay said she expects earnings to decline below 2006 levels in the third and fourth quarters. The stock fell sharply at the end of the regular trading day following the comments, ending the session off 6.4 percent." Additionally, the same report noted that, "Shares of Office Depot Inc. fell in premarket trading Friday, after the office supplies retailer at an industry conference said small businesses are cutting spending due to the effects of the weak housing market. Shares sank 71 cents, or 3.2 percent, to $21.23 in premarket trading Friday after closing at $21.94 Thursday." The disclosure of declining operating profit margins was substantially related to and a direct and foreseeable consequence of Office Depot's inability to further manipulate its inventory reserves and vender funding accounting in the third and fourth quarters of 2007. Thus, a substantial,

if not primary cause, of investor losses on September 6 and 7, 2007 was related directly to the fraud set forth in this Complaint.

153.    On October 29, 2007, Office Depot disclosed a delay in its third quarter 2007 earnings disclosure "due to an independent review by the Audit Committee of the Company's vendor program funds. The review relates principally to the timing of the recognition of certain vendor program funds." This disclosure partially revealed one particular aspect of the fraud. Office Depot's share price decline on October 29, 2007 was 14.1%, falling from $20.29 on October 26 to $17.43 on October 29, 2007. On November 20, 2007, Office Depot then disclosed the restatement of its earnings from the third quarter of 2006 through the second quarter of 2007 and disclosed its financial results for the third quarter of 2007. These disclosures led to a 7.0% share price decline on November 20 and another 4.4% share price decline on analyst commentary and news reports on November 21, 2007. A number of analysts on November 20 and 21, 2007, including Credit Suisse, William Blair, Deutsche Bank, Bear Stearns, and Jefferies & Company reduced price targets, reduced earnings per share estimates for 2007 and 2008 and/or cut their stock recommendations as a result of the informal SEC investigation, the restatements, and the evidence of substantially lower operating margins (significantly resulting from the vendor and inventory issues set forth in the Complaint). Similarly, Standard & Poor's changed Office Depot's credit rating outlook to negative from stable on November 21, 2007 as a result of the SEC investigation, restatements and margin pressures. Thus, the primary cause for the decline in Office Depot's share price between October 29 and November 21, 2007 was the result of the partial disclosure of one aspect of the fraud alleged in the Complaint. The disclosures on November 20, 2007 revealed that Office Depot's margins were declining and under pressure substantially as a result of the inventory and vendor funding issues set forth in the Complaint.

154.    On December 12, 2007, Office Depot disclosed substantially lower vendor funding and additional margin pressures in the fourth quarter of 2007.  As was ultimately revealed in the fourth quarter 2007 earnings disclosures on February 26, 2008, the vendor funding and inventory issues set forth in this Complaint were a substantial, if not the primary, cause of this disclosure. Having partially restated its prior financial statements for the vendor funding issue on November 20, 2007 and while under investigation by the SEC for accounting, Office Depot's ability to maintain inflated earnings was lost in the fourth quarter of 2007.  Thus, Office Depot was compelled to reverse in the fourth quarter of 2007 much of the prior inventory and vendor funding misstatements not already corrected.  As a result, Office Depot's share price fell 11.5% on December 12, 2007 (from $16.99 on December 11 to $15.04 on December 12, 2007) and continued to decline on December 13 and later in December 2007.

155.    Office Depot finally revealed the full extent of these issues and the relevant truth set forth in this Complaint in its earnings press release and conference call on February 26, 2008 and in Office Depot's February 26, 2008 Form 10-K filing for the year ended December 31, 2007.  For reasons directly related to the fraud, Office Depot disclosed on February 26, 2008: (i) the departure of its CFO McKay on March 1, 2008; (ii) that the SEC was conducting a formal securities-fraud investigation of the Company as a result of its vendor accounting; and (iii) dramatically lower-than-expected earnings and operating profit margins for the fourth quarter of 2007 for reasons substantially and directly related to the fraud set forth in this Complaint (including expenses associated with the investigation and restatement of Office Depot's prior financial results, lower vendor funding, lower gross profit margins due in large part to obsolete inventory, and increased inventory reserves and other charges).  The earnings press release disclosed "lower than expected vendor program funding,

-71-

lower product margins, a de-leveraging of fixed property costs, and higher shrink" as contributing significantly to the lower operating profit margin realized by Office Depot's North American Retail Division in the fourth quarter of 2007. Of these items, the lower vendor program funding, lower product margins and higher shrink were all directly foreseeable consequences of and the result of the recognition of the full extent of the fraud as set forth in this Complaint.

156.    During the conference call on February 26, 2008, Chuck Rubin, Office Depot's President for North American Retail, acknowledged, consistent with the earnings press release, that lower vendor funding and lower product margins contributed substantially to the poor operating results in the fourth quarter of 2007. He further stated, "We also pursued inventory clearance activities which mitigated inventory risk but further compressed our product margins." Steve Schmidt, Office Depot's President for North American Business Solutions, also stated during the conference call that, "lower vendor program funding reduced margins [in his division] by 220 basis points" and "higher inventory clearance reserves and returned product lowered margins [in his division] by 160 basis points."

157.    The extent of Office Depot's inventory and vendor funding problems was similarly confirmed in Office Depot's Form 10-K for the year ended December 31, 2007. As discussed in Office Depot's Form 10-K, Office Depot was forced to recognize $8 million in the fourth quarter of 2007 as additional reserves for inventory obsolescence and margin issues and was not able to fully estimate the effect of vendor rebate issues until the year-end. Additionally, increased sales of obsolete inventory on "clearance" terms contributed significantly to the decline in reported earnings in the fourth quarter of 2007. Thus, these items contributed substantially to the decline in 2007 division operating profits to $805.7 million from 2006 division operating profits of $1,070.0 million and were

the primary reason for the increase in charges for losses on receivables and inventories from $85.6 million in 2006 to $109.8 million in 2007.   A total of $31 million in charges were recognized in the fourth quarter of 2007.   Thus, the implicit recognition and disclosure of the extent of the inventory reserve and obsolescence problems contributed substantially to the decline in Office Depot's net earnings in the fourth quarter of 2007 to only $18.8 million ($0.07 per diluted share) as compared with $126.6 million ($0.45 per diluted share) in the fourth quarter of 2006, despite a slight increase in total sales in the fourth quarter of 2007 relative to the fourth quarter of 2006 (Form 10-K for the year ended December 31, 2007, page 66).

158.    The disclosures on February 26, 2008 not only revealed more fully the full extent of the "relevant truth" and effectively restated Office Depot's financial results to correct for the prior fraud but acknowledged that the declines in Office Depot's forecast operating margins and earnings guidance disclosed on July 26, 2007 and September 7, 2007 and the associated investor losses on analyst downgrades on July 27, September 6 and October 15, 2007 were substantially related to the "relevant truth" and, therefore, partially corrective.   Additionally, the February 26, 2008 disclosures revealed that the disclosures on October 29, November 20 and December 12, 2007, while clearly corrective and led to substantially investor losses, were only partially corrective and did not reveal the full extent of the fraud and relevant truth revealed on February 26, 2008.

159.    The disclosures on February 26, 2008 led to a significant decline in Office Depot's share price from $14.27 on February 25, 2008 to $13.38 on February 26, 2008.   Additionally, analyst downgrades and reduced price targets (based significantly on the SEC investigation, the vendor, inventory and operating margin issues and the CFO departure) on February 27, 2008 caused Office Depot's share price to fall to $12.47 on February 27, 2008.   Office Depot's share price continued to

decline to $11.98 on February 28, 2008 as Moody's Investor Service "cut the outlook on Office Depot to stable from positive" and fell further to $11.37 on February 29, 2008 when Standard & Poor's Rating Service kept Office Depot on CreditWatch for negative implications based significantly on the poor operating margins and SEC investigation.

160.    In total, Office Depot's share price fell 20.3% from the close on February 25, 2006 (the end of the Class Period) to the close on February 29, 2008.  By comparison, the share prices of OfficeMax and Staples on average declined only 7.4% in over the same four day period of trading. This loss was in addition to the 11.5% share price decline associated with a preliminary disclosure to investors of a portion of the relevant truth on December 12, 2007; the 7.0% and 4.4% share price declines on November 20 and 21, 2007; and the 14.1% share price decline on October 29, 2007.  As previously discussed, these investor losses were substantially caused by the revelation of the relevant truth in Office Depot's continued vendor funding issue and inventory and margin issues and the associated notice of the SEC investigation and cannot be explained by economic or industry factors and other factors unrelated to the fraud set forth in this Complaint.

**Office Depot's Stock Price Decline Relative to Peers (OfficeMax and Staples)**



## COUNT I

**Alleged For Violations Of Section 10(b) Of The 1934 Act And Rule 10b-5 Promulgated Thereunder Against All Defendants**

161.    Lead Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

162.    During the Class Period, Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Office Depot common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Office Depot stock at artificially inflated prices that did not reflect the stock's true value.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

163.    These Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market price for Office Depot common stock in violation of Section 10(b) of the 1934 Act and Rule 10b-5.  These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Office Depot, as alleged below.

164.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements

and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

165.    Defendants,  individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, performance, operations, and prospects of Office Depot as specified herein.  Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Office Depot's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Office Depot and its business, operations, performance, and prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Office Depot stock during the Class Period.

166.    The Individual Defendants' primary liability, and controlling person liability, arises from the following facts, among other things:  (i) each was a high-level executive and director at the Company during the Class Period; (ii) by virtue of their responsibilities and activities as a senior

executive officer and director of the Company, were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and reports; and (iii) each was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

167.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available.   Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth regarding Office Depot's business, operations, performance, and prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

168.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Office Depot common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Office Depot shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class

Period, Lead Plaintiffs and the other members of the Class purchased Office Depot common stock during the Class Period at artificially inflated high prices and were damaged thereby.

169.   At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the business, operations, performance, prospects, and intrinsic value of Office Depot, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased their Office Depot securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

170.   By virtue of the foregoing, Defendants each violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

171.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Alleged For Violations Of Section 20(a) Of The 1934 Act Against Individual Defendants**

172.   Lead Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants as previously defined.

173.   The Individual Defendants were and acted as controlling persons of Office Depot within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and awareness of the Company's operations and intimate knowledge of the Company's actual performance, the Individual Defendants had the power to

influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

174.    In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company at the highest levels and, therefore, are presumed to have had the power to control or influence the particular acts and transactions giving rise to the securities violations as alleged herein, and exercised the same.

175.    As set forth above, each Defendant violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Office Depot, the Individual Defendants also are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

(i)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(ii)    Awarding plaintiffs and members of the Class damages in an amount to be determined

at trial, together with interest thereon;

(iii)    Awarding plaintiffs and members of the Class pre-judgment and post-judgment interest, as allowed by law, as well as attorneys' and experts' fees and other costs; and

(iv)    Awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants's assets to assure plaintiffs have an effective remedy.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: July 2, 2008.                    Respectfully Submitted,

s/   Alan B. Rose

_____
L. Louis Mrachek
Florida Bar No. 182880
Alan B. Rose
Florida Bar No. 961825
**PAGE, MRACHEK, FITZGERALD & ROSE, P.A.**
Suite 600
505 S. Flagler Dr.
West Palm Beach, Florida 33401
Phone:  (561) 355-6970
Fax:  (561) 655-5537

*Liaison Counsel*

**CAULEY BOWMAN CARNEY & WILLIAMS, PLLC**
J. Allen Carney
Darrin L. Williams
Randall K. Pulliam
11311 Arcade, Suite 200
Little Rock, AR 72212
Phone: (501) 312-8500
Fax: (501) 312-8505

*Counsel for Lead Plaintiff New Mexico ERB*

-81-

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 2, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/   Alan B. Rose

_____
Alan B. Rose
Florida Bar No. 961825

-82-

**SERVICE LIST**
**SHEET METAL WORKERS LOCAL 28 PENSION FUND v. OFFICE DEPOT, INC., et al**
**Case No. 07-civ-81038 (HURLEY/HOPKINS)**

| | |
|---|---|
| Joseph E. White, III, Esquire<br>e-mail:  jwhite@saxenawhite.com<br>Maya Susan Saxena, Esquire<br> e-mail:  msxena@saxenawhite.com<br>Saxena White, P.A.<br>2424 North Federal Highway, Suite 257<br>Boca Raton, FL 33431<br>(561) 394-3399 Telephone<br>(561) 394-3382 Facsimile<br>Attorneys for **Plaintiff Sheet Metal**<br>**Workers Local 28 Pension Fund**<br>via CM/ECF | Alvin F. Lindsay, III, Esquire<br>e-mail: aflindsay@hhlaw.com<br>Hogan & Hartson<br>1111 Brickell Avenue, Suite 1900<br>Miami, FL  33131<br>(305) 459-6500 Telephone<br>(305) 459-6550 Facsimile<br>Attorneys for **Defendant**<br>**Office Depot, Inc.**<br>via CM/ECF |
| David J. George, Esquire<br>e-mail:  dgeorge@csgrr.com<br>Coughlin Stoia Geller Rudman & Robbins LLP<br>120 East Palmetto Park Road, Suite 500<br>Boca Raton, FL 33432<br>561-750-3000 Telephone<br>561-750-3364 Facsimile<br>Attorneys for **Plaintiff Bond Nicholas**<br>via CM/ECF | |