UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-81038-CIV-HURLEY
[lead action - consolidated with Case No. 07-14348]

SHEET METAL WORKERS LOCAL 28 PENSION FUND,
individually and on behalf of all others similarly situated,
        plaintiffs,

vs.                                              **CLOSED CASE**

OFFICE DEPOT, INC., STEVE ODLAND and
PATRICIA McKAY,
        defendants.
_____/

BOND NICHOLS individually and on behalf of all others
similarly situated,
        plaintiffs,

vs.

OFFICE DEPOT, INC., STEVE ODLAND and
PATRICIA McKAY,
        defendants.
_____/

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
[DE # 77: Case No. 07-81038] [DE # 50: Case No. 07-1438]
& FINAL ORDER OF DISMISSAL WITH PREJUDICE & CLOSE-OUT

On March 31, 2009, this court dismissed the plaintiffs' consolidated amended complaint for

failure to adequately plead   facts giving rise to a strong inference of scienter in accordance with

the strict pleading requirements imposed by the Private Securities Litigation Reform Act of 1995

("PSLRA"), 15 U.S.C. §§ 78u-4, 78u-5 [DE# 68: Case NO. 07-80138; DE # 40: Case No. 07-1438].

The plaintiffs have since filed a second  amended consolidated complaint [DE # 74: Case

No. 07-81038; DE # 47: Case No. 07-1438]] and the case is again before the court upon the

1

defendants' motion to dismiss for failure to allege sufficient facts to support a strong inference of scienter against the individually named defendants. Having carefully reviewed the allegations of the second amended consolidated complaint, the defendants' motion to dismiss and the plaintiffs' response in opposition, the court concludes that the plaintiffs' amended pleading does not cure the pleading deficiencies previously identified, and that the complaint is appropriately dismissed with prejudice at this juncture.

### Summary of Second Amended Consolidated Complaint

Plaintiffs essentially allege that defendant Office Depot's SEC filings during the Class Period were false when made because, as revealed in a November 8, 2007 Restatement, the company's financial results regarding gross profits, operating profits, net earnings and earnings per share were inaccurate due to incorrect accounting for vendor rebates in violation of Generally Accepted Accounting Principles (GAAP).

As described in both the first and second amended consolidated complaint, the defendant company overstated these numbers through fraudulent manipulation of the company's vendor rebate program: First, Office Depot retail merchants, responding to sales pressure from upper management, engaged in a widespread practice of ordering excessive amount of product from vendors at the end of each fiscal quarter, allowing the company to prematurely recognize vendor rebates associated with that product as income. Second, to hide the surplus inventory created by the excess ordering, individuals within the Office Depot Supply Chain Division directed the closure of all Office Depot warehouses and refused delivery of product in the waning days of each financial quarter, thereby artificially lowering the company's inventory and allowing the company to avoid write-downs of obsolescent reserves.

In its original order of dismissal, the court found insufficient specific facts from which a reasonable person could infer that it is as likely as not that the high ranking executives named as defendants in this suit either orchestrated this scheme, learned about it before the SEC filings in question were made, or were severely reckless in not learning of it before that time. Rather, the court found the strongest available inference available to be that Odland and other Office Depot executives set aggressive sales goals for the company's merchants and were unaware of fraudulent artifices used by members of the company's merchandising operation in effort to reach those goals during fiscal year 2006 and the first two quarters of 2007.

In their newly amended complaint, plaintiffs seek to cure this pleading deficiency with allegations from five new confidential witnesses ("CW") who allege that the existence of a large scale warehouse "lock down" pattern was well known throughout all echelons of the company, occurring as it did at the end of each fiscal quarter and year during the Class Period at every one of the company's twenty distribution centers and twelve cross docks. Requiring coordination between the company's Finance Group (led by defendant McKay), which allegedly conceived the plan, the North American Retail Group (led by Executive Committee member Chuck Rabin) and the Supply Chain Division (which ordered the warehouse closures), plaintiffs assert it is inconceivable that such a project could have occurred without the knowledge and approval of all members of the Executive Committee.

Plaintiffs claim that a plausible, if not the only plausible, inference available from a global reading of the complaint in light of these supplemental allegations is that the Office Depot vendor rebate/inventory lockout scheme was "dictated and encouraged" by the company's Executive Committee, including defendant officers Steve Odland and Patricia McKay, in order to artificially

3

inflate the company's financial performance.

The statements attributed to Confidential Witness Nos. 1 through 5 are summarized in the court's original order of dismissal. The statements attributed to newly added Confidential Witnesses CW6 through CW10 are summarized as follows:

Plaintiffs identify CW6 as the Office Depot Regional Vice President for Supply Chain from 2001 through March 2008 whose region covered eleven warehouses spread over the central and southern United States (one third of all Office Depot warehouses). CW6 reportedly "confirmed" that throughout the Class Period, Office Depot had a "company practice, dictated by the Executive Committee,"of locking out trucks full of inventory from the warehouses at the end of each fiscal quarter and each fiscal year. CW6 surmises that this practice was used to "help the books look better" and to "cover up decreasing sales."

CW6 describes the decision behind this practice as one emanating "out of the finance group through the powers that be." His superior, Sr. Vice President for Supply Chain, Dennis Andruskiewicz, allegedly told him that "a company decision has been made" and that while Andruskiewicz "took exception to what they were doing," he said it was "non-negotiable." CW6 avers that "they made it sound like it came from Odland or McKay to assist finance with closing the books," but in reality it was "an executive decision to make the books look good." [Complaint ¶¶ 107-110].

Next, plaintiffs identify CW 7 as a Merchant Director in the Office Depot Merchandising Division from mid -2005 through September 2006. CW7 describes "up front dollars and signing bonuses" as "a big focus" at Office Depot. He states that he labored under a heavy annual sales budget which was assigned from "the top down," and he attended monthly financial meetings at

4

which he and other merchants were "called out" by Executive Committee member Chuck Rubin for not collecting enough vendor rebate dollars. He also "confirmed" that Office Depot "purposefully" and "intentionally" drew down inventory levels by refusing to accept delivery of new inventory for the last several days of each fiscal quarter, and that "the Company" even sent out emails advising its retail merchants of the last day for receiving inventory near the end of each quarter as well as the date on which the warehouses would reopen in the following quarter. He does not identify the author or source of these emails, but says Executive Committee member Chuck Rubin "would have to approve"of such a directive because it directly impacted inventory levels and required coordination and cooperation of at least three core divisions within the Executive Committee structure – North American Retail, Supply Chain and Finance Group. [Complaint ¶¶ 111-117]

Plaintiff next identifies CW8 as an Office Depot Senior Accountant assigned to the Inventory Accounting Team between May 1996 to July 2008, responsible for analyzing all inventory in the Untied States, Puerto Rico and Canada. CW8 reported to Manager of Inventory Accounting, who in turn reported to Vice President of General Accounting. Like CW6 and CW7, CW8 "confirmed" through unidentified sources that Office Depot locked the gates of its distribution centers and cross docks for three or four days prior to end of certain fiscal quarters and fiscal years. She explains that this practice improved the company's publicly reported "debt to equity position" by making it look like the Company owed less money for inventory, while in reality the company was manipulating its financial performance.

CW8 reports that when the inventory manipulation came to light, company auditors "made us go back and add accounting entries to address it," i.e. they were directed to account for "inventory that was sitting outside" the warehouses at the end of the quarters or fiscal year. [¶¶118-120]. She

5

assumes that CEO/Defendant Odland "would have known if not made the decision himself" regarding the inventory lockouts, because he was the type of manager that "knew a lot of details you wouldn't think someone at his level would have known or focused on," and was "very well informed about company operations down to a fine level of detail." [¶121].

CW 9 is next identified as the Inventory Planner for the Office Depot Technology Dept. between May 5, 2005 through January, 2007. CW9 also "confirmed" through unidentified sources that the company followed a practice of closing warehouses and locking out inventory a few days before the end of each quarter during the Class Period. He says his superior, Ed Walters, Director of Inventory Planning, talked about "emptying out the warehouses to keep inventory down," and that he understood that this was done so that inventory was "not on the books." CW 9 states that the Supply Chain Division generated emails "discussing" this practice, and that it was also referenced "through word of mouth" by the Vice President of Supply Chain and the Vice President of Logistics at meetings attended by CW 9 and the entire Supply Chain team shortly before the end of 2006. As to whether any senior managers were specifically aware of the inventory lockout practice, CW 9 states "everybody knows that ... Office Depot is a team." [¶¶123-124]

Finally, plaintiffs identify CW10 as Manager of Supply Chain Operations and Finance between 2003 and November 2008 who reported to Mark Yoshiman in Vendor Performance. CW10 likewise "confirms" through unidentified sources that the company followed a policy of closing warehouses and refusing to accept inventory during the last few days before end of quarter. She indicates that she was responsible for sending emails to vendors to advise and remind them of these warehouse closures, a message which "came down from up above." She says that the specific person who directed her to send the emails was Mark Yoshiman, her direct superior, but "is sure

6

Yoshiman was directed to do so by his superiors." [Complaint ¶¶ 125-126].

Viewed in conjunction with similar allegations attributed to CW 1 through 5 in their original amended complaint, plaintiffs contend, "in the end," that it is "implausible" that Odland and McKay, or any other member of Executive Committee were "simply unaware of a scheme so widespread, well known and consequential to day- to-day operations." [Complaint, ¶ 21]. From here, they urge that the scienter of Odland and McKay is appropriately inferred, either on theory that -- as members of the Executive Committee -- they actively directed and encouraged the scheme; that they at least knew about the scheme when they reported on the company's financial performance, or that they were "severely reckless" in not knowing about it when they made the relevant reports.

**Discussion**

A §10(b)/Rule 10b-5 claim must meet the exacting pleading standards of the Private Securities Litigation Reform Act (PSLRA) of 1995 which sets forth rigorous standards of pleading both for the false or misleading and the scienter elements of a securities fraud claim. Under the PSLRA, a complaint alleging securities fraud must set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1). Further, to allege scienter sufficiently, the complaint must, with respect to each act or omission alleged to violate the statute, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). If a complaint does not meet these statutory pleading requirements, dismissal is required. 15 U.S.C. § 78u-4)b)(3)(A).

As interpreted by the Eleventh Circuit, the scienter requirement means that the complaint must plead particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner. *Bryant v Avado Brands, Inc.*, 187 F.3d 1271, 1273 n. 1 (11th Cir. 1999). "Severe recklessness" is limited to those highly unreasonable omissions or misrepresentation that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care and which present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id* at 1282 n. 18; *McDonald v Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989).

In making this assessment, factors such as a reckless or improper audit, the magnitude of the fraud, and "red flags"[1] should be examined individually, with the context as a whole playing a role in the court's determination. *In re MicroStrategy, Inc. Securities Litigation*, 115 F. Supp. 2d 620, 649 (E.D. Va. 2000).

Further, in determining whether a complaint shows a strong inference of scienter, the court must engage in a comparative evaluation; it must consider not only the inferences urged by the plaintiff, but also the competing inferences rationally drawn from the facts alleged. *Tellabs, Inc. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 168 L.Ed.2d 179 (2007). An inference of scienter must be more than merely "reasonable or permissible - it must be cogent and compelling, thus strong in light of other explanations." *Id* 127 S. Ct. at 2510. A complaint will survive under

---

[1]

"Red flags" are "those facts which come to the attention of a [defendant] which would place a reasonable [defendant] on notice that the ... company was engaged in wrongdoing to the detriment of its investors." *In re Eagle Bldg. Tech. Inc. Sec. Litigation*, 319 F. Supp. 2d 1318, 1328 (S.D. Fla. 2004)

application of this standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Although allegations of accounting violations may provide some support for scienter allegations, such allegations must be underpinned by other particularized allegations that defendant possessed the requisite fraudulent intent. *Ziemba v Cascade Intern. Inc.,* 256 F.3d 1194 (11th Cir. 2001*); In re Worlds of Wonder Securities Litigation,* 35 F.3d 1407 (9th Cir. 1994), *cert. den.* 516 U.S. 868 (1995). Nor is scienter pleaded sufficiently by an allegation that a defendant "must have had" knowledge of the facts by virtue of his or her position of control within the corporate hierarchy and "hands on" management style. *Rosenberg v Gould,* 554 F.3d 962, 966 (11th Cir. 2009); *Indiana Elec. Workers' Pension Trust Fund IBEW v Shaw Group, Inc.,* 537 F.3d 527 (5th Cir. 2008); *In re Pegasus Wireless Corp Securities Litigation,* 2009 WL 3055205 * 6 and cases cited *infra* (S. D. Fla. 2009).

Allegations attributed to confidential witnesses may be used to support an inference of scienter, but in order to contribute meaningfully toward a strong inference of scienter they must be accompanied by particularized detail sufficient to support a reasonable conviction of the informant's basis of knowledge. In other words, the plaintiff must plead with substantial specificity how they CW came to learn of the information they provide in the complaint. *In re North Point Communications Group Inc. Securities Litigation,* 184 F. Supp. 2d 991 (N.D. Cal. 2001). The weight to be afforded such allegations hinges on the particularity of the allegation made, the foundation or basis of the confidential witnesses' knowledge, including the position held, the proximity to the offending conduct, and the relevant time frame. *Mizzaro v Home Depot, Inc.,* 544 F.3d 1230, 1240 (11th Cir. 2008). Generic and conclusory statements based on rumor or conjecture

cannot support an inference of scienter. *California Pub Employees Ret. Sys v Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004).

In this case, the allegations of the second amended  consolidated complaint do not demonstrate with substantial specificity  how each Confidential Witness came to learn of the information imparted in the complaint. While all witnesses all "confirm" the widespread existence of a warehouse lockout practice, no one identifies the source from which he or she learned about the practice and no one describes any  facts linking this practice to the company's alleged intent to manipulate inventory levels. Moreover, no witness claims knowledge, direct or indirect, of any communication made by either defendant that could reasonably be  interpreted to reflect his or her  knowledge, direction or encouragement of the alleged vendor rebate scheme. No witness claims to have even met either defendant.   Further, there are no claimed emails, letters or other communications from either  defendant expressly ordering or  suggesting that Office Depot employees process fraudulent vendor rebates.

And,  even if the statements attributed to the confidential witnesses are collectively interpreted to read that everyone at Office Depot -- including Executive Committee members Odland and McKay -- knew about  warehouse closures  at the end of each  fiscal quarter, there are no facts alleged tying the closures to an intent to hide artificially inflated inventory levels precipitated by excess ordering associated with the vendor rebate scam.

What is missing, in short,  is the kind of essential detail necessary to give rise to a strong inference that, to the extent Odland or McKay participated in  preparation of the financial reports in question,  he or she acted with an intent to deceive or acted with severe recklessness in recognizing revenues generated from  vendor rebates  during the Class Period.

As the second amended consolidated complaint is devoid of allegations from which either individual defendant's actual or constructive knowledge of the alleged vendor rebate/ warehouse lockout/inventory manipulation scheme may reasonably be inferred, the complaint is appropriately dismissed with prejudice for failure to adequately plead scienter against the individually named defendants. *See e.g. Rosenberg v Gould*, 554 F.3d 962, 966 (11th Cir. 2009); *Mizzaro v Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008); *Garfield v NDC Health Corporation*, 466 F.3d 1255 (11th Cir. 2006); *Weiss v Amkor Technology, Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007); *Wojtunik v Kealy*, 394 F. Supp. 2d 1149 (D. Ariz. 2005); *In re Galileo Corp Shareholders Litigation*, 127 F. Supp. 2d 251(D. Mass. 2001).

It is accordingly **ORDERED AND ADJUDGED**:

1. The defendants' motion to dismiss the plaintiff's second amended consolidated complaint [DE # 77 - Case No. 07-81038] [DE # 50 - Case No. 07-1438] is **GRANTED.**

2. The plaintiffs' second consolidated amended complaint is **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6) and the heightened pleading requirements of the PLRSA.

3. The Clerk of Court is directed to close this file and terminate any pending motions as moot.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this _14_ day of January, 2010.

Daniel T. K. Hurley
United States District Judge

cc. All counsel

For updated court information, see unofficial website at www.judgehurley.com

**CLOSED CASE**